E-FILED
11/21/2024 3:50 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

**IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE**
**TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY**

| | | |
|---|---|---|
| **FOUNDATION BUILDING MATERIALS, LLC,** | ) | |
| **Plaintiff,** | ) | **Case No.** |
| **v.** | ) | **Judge:** |
| **IRONLINE METALS, LLC** | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff, Foundation Building Materials, LLC ("FBM" or "Plaintiff"), by and through its attorneys, respectfully submits this Complaint against Defendant, Ironline Metals, LLC ("Ironline" or "Defendant"), and states as follows:

## PARTIES

1. FBM is a limited liability corporation incorporated and existing under the laws of the State of California with its principal place of business located at 2520 Red Hill Avenue, Santa Ana, California 92705. FBM is authorized to and does conduct business in the state of Tennessee.

2. Ironline is a limited liability corporation incorporated in and existing under the laws of the state of Delaware with its principal place of business located at 39 Jinks Street, Yemassee, South Carolina 29945. Ironline is authorized to and does conduct business in the state of Tennessee.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to Tenn. Code Ann. §§ 16-11-101-103.

4. This Court has personal jurisdiction over Ironline because this action arises out of Ironline's conduct causing tortious injury to FBM in this state. Tenn. Code Ann. § 20-2-223(a)(3), and (4).

5. Venue is proper in this Court pursuant to Tenn. Code Ann. §§ 20-4-104 because the cause of action arose in Davidson County, Tennessee, where FBM employed its former employee Robert C. Bowser ("Bowser") and where Ironline interfered with a valid and enforceable non-compete and non-solicit agreement between FBM and Bowser.

## FACTS

### A. FBM's Business

6. FBM is a leading construction materials distributor with over 300 locations throughout the United States and Canada. FBM specializes in the local supply of building materials such as drywall and steel studs, as well as lath, plaster, stucco, acoustical ceilings, insulation, fiberglass reinforced panels, and exterior insulation finish systems.

7. FBM employs sales professionals to cultivate relationships with customers and assist in purchasing building materials.

### B. Ironline's Business

8. Ironline is a direct competitor of FBM as both FBM and Ironline are in the business of supplying and distributing building materials. Ironline maintains a physical location at 733 Massman Drive, Nashville, Tennessee 37210, which is within 50 miles of the FBM branches that Bowser oversaw until his resignation on July 22, 2024. According to its website, Ironline describes its product line as including "steel studs, metal deck, fasteners and ties/clips." Ex. 1, Ironline Website (https://www.ironlinemetals.com/about-us-2/who-we-are). Ironline has also begun providing drywall to customers in Nashville.

## C. Bowser's Employment with A&D

9. Prior to his employment with FBM, Bowser was employed by A&D Supply of Nashville, LLC ("A&D"), also a construction materials distributor. In connection with his hiring at A&D, Bowser entered into an Employment Agreement with A&D (the "A&D Employment Agreement"), effective December 16, 2019, that included an Incentive Plan which identified Bowser as one of three "Key Employees" who was "highly paid and is employed by the Company to perform managerial and/or sales duties, that will directly contribute to and drive the financial success of the Company." *See* Ex. 2 (A&D Employment Agreement), Ex. B. The A&D Employment Agreement also included restrictive covenants, including a covenant not to compete with the Company within 25 miles of the Company's principal place of business in Nashville, for the longer of 18 months after termination of employment or the period over which Bowser received Incentive Plan payments and an additional 12 months thereafter. Ex. 2 at ¶ 7.

10. As part of Bowser's Incentive Plan with A&D, he was entitled to a "Sale Bonus" in the event of a sale of substantially all of the assets of A&D, conditioned upon, among other things, Bowser entering into and not defaulting on any "employment agreement, and/or a non-solicitation, non-interference, non-competition or non-disclosure/confidentiality agreement as part of the closing of the Transaction," as may be required by the Purchaser.

11. On October 2, 2023, FBM entered into an Asset Purchase Agreement with A&D (the "Transaction"). As part of the closing of the Transaction, A&D entered into a Compensation and Release Agreement with Bowser in which A&D agreed to pay Bowser the Sales Bonus of $470,000 and Bowser acknowledged that he was only entitled to the Sales Bonus if he entered into an employment agreement with FBM including confidentiality, non-solicitation, non-interference and non-competition covenants in a form acceptable to FBM.

## D. Bowser's Employment with FBM

12. In connection with that Transaction, on October 2, 2023, Bowser and FBM entered into an Employment Agreement (the "Employment Agreement") wherein they agreed that Bowser would become the Nashville Sales Manager of FBM upon the closing of the Transaction between A&D and FBM. *See* Ex. 3 (Employment Agreement).

13. As the Nashville Sales Manager, Bowser would oversee the sales team in two FBM branches in Nashville, Tennessee (one of which had previously belonged to A&D). Bowser would report to the FBM Regional Vice President for the Southeast Region, George "Jordon" Anderson. Bowser received a base salary of $171,600 from the date his employment with FBM commenced through 2023 in accordance with his Employment Agreement. Beginning January 1, 2024, Bowser received a base salary of $145,330 per annum in accordance with his Employment Agreement. In mid-2024, Bowser's salary was readjusted back to $171,600. Bowser was also eligible to earn: (a) an annual cash performance bonus based on the achievement of company and regional performance targets each calendar year; and (b) quarterly operating income bonuses.

## E. Bowser's Restrictive Covenants with FBM

14. Consistent with Bowser's position at FBM and his prior position at A&D, his FBM Employment Agreement also contained restrictive covenants, including confidentiality, non-solicitation, and non-competition provisions.

15. Paragraph 4 of the Employment Agreement provides as follows:

> **4. Restrictive Covenants**. The Employee acknowledges that the Company has spent significant time, effort and resources protecting its Confidential Information and customer goodwill. The Employee further acknowledges that the Confidential Information is of significant competitive value to the Company in the industry in which it competes, and that the use or disclosure, even if inadvertent, of such Confidential Information for the benefit of a competitor would cause significant damage to the legitimate business interests of the Company.

16. Paragraph 4(a) of the Employment Agreement provides as follows:

(a) Confidential Information. During Employee's employment with the Company, the Employee will be given access to and receive Confidential Information regarding the business of the Company and its affiliates. The Employee agrees that the Confidential Information constitutes protectable business interests of the Company and its affiliates and covenants and agrees that at all times during the Employee's employment with the Company, and at all times following the Employee's termination, the Employee will not, directly or indirectly, disclose any Confidential Information. As used in this Agreement, the term "Confidential Information" means any and all confidential, proprietary or trade secret information of the Company or an affiliate not within the public domain, whether disclosed, directly or indirectly, verbally, in writing (including electronically) or by any other means in tangible or intangible form, including that which is conceived or developed by the Employee, applicable to or in any way related to: (i) the present or future business activities, products and services, and customers and suppliers of the Company or its affiliates; (ii) the research and development of the Company or its affiliates; or (iii) the business of any customer or vendor of the Company or its affiliates. Such Confidential Information includes the following property or information of the Company or its affiliates, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, customer lists, supplier lists, designs, drawings, algorithms, source code, object code, know-how, improvements, inventions, licenses, techniques, all plans or strategies for marketing, development and pricing, business plans, financial statements, profit margins and all information concerning existing or potential clients, suppliers or vendors. Confidential Information of the Company also means all similar information disclosed to any member of the Company by third parties that is subject to confidentiality obligations. The Company shall not be required to advise the Employee specifically of the confidential nature of any such information, nor shall the Company be required to affix a designation of confidentiality to any tangible item, in order to establish and maintain its confidential nature. Notwithstanding the preceding to the contrary, Confidential Information shall not include general industry information or information that is publicly available or readily discernable from publicly available products or literature; information that the Employee lawfully acquires from a source other than the Company or its affiliates or any client or vendor of the Company or any of its affiliates (provided that such source is not bound by a confidentiality agreement with the Company or any of its affiliates); information that is required to be disclosed pursuant to any law, regulation, rule of any governmental body or authority, or stock exchange, or court order; or information that reflects Employee's own skills, knowledge, know-how and experience gained prior to employment or service and outside of any connection to or relationship with the Company or any of its affiliates, or the predecessors of any such entities; and information that was known by the Employee prior to his employment with the Company. Notwithstanding the foregoing, Employee will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, if Employee files a lawsuit for retaliation by

Company for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's attorney and use the trade secret information in the court proceeding if Employee files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order.

17. Paragraphs 4(c) and 4(d) of the Employment Agreement prohibit solicitation of FBM's employees and customers during the Restricted Period:

> (c) Agreement Not to Solicit Employees. The Employee agrees that during the period commencing on the Effective Date and ending on the date that is two (2) years after the Date of Termination, whether voluntary or involuntary (the "Restricted Period"), the Employee shall not, directly or indirectly, on behalf of himself or any other person or entity (A) cause, induce, or attempt to cause or induce any employee, agent, or independent contractor of the Company (who had that status prior to the Date of Termination) to terminate such relationship; (B) in any way interfere with the relationship between the Company and any of its employees, agents, or independent contractors; or (C) hire, retain, employ, or otherwise engage or attempt to hire, retain, employ, or otherwise engage as an employee or otherwise, any employee of the Company prior to the Date of Termination.
>
> (d) Agreement Not to Solicit Customers. The Employee agrees that during the Restricted Period, the Employee shall not, directly or indirectly, on behalf of himself or any other person or entity (A) solicit, induce, or otherwise cause, or attempt to solicit, induce, or otherwise cause, any customer, supplier, licensor, licensee, or any prospective customer, supplier, licensor, or licensee that has been contacted or targeted for contact by the Company at any time prior to the Date of Termination, or any other person engaged in a business relationship with the Company at any time prior to the Date of Termination, to (1) terminate, curtail, or otherwise modify its relationship with the Company or the Company's affiliates or (2) engage in business with a competitor of the Company or the Company's affiliates, or (B) interfere in any way with the relationship between the Company and its affiliates, on the one hand, and any of their respective current or prospective customers, suppliers, licensors, licensees, or any other person engaged in a business relationship with the Company or its affiliates, except as directed by and for the benefit of the Company or its affiliates.

18. Paragraph 4(e) of the Employment Agreement prohibits competition by Bowser during the Restricted Period within 50 miles of the facilities where Bowser oversaw sales representatives:

> (e) Agreement Not to Compete. In order to protect the legitimate business and customer goodwill interests of the Company, to protect that Confidential Information against inappropriate use or disclosure, and in consideration for the Employee's employment and the benefits provided to the Employee (including, without limitation, the benefits payable to the Employee pursuant to this

> Agreement), the Employee hereby agrees that during the Restricted Period, whether voluntary or involuntary, the Employee shall not directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, manager, employee, partner, equity holder, member, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any Competitive Business anywhere within 50 miles of the branch(es) of the Company that Employee oversees or engages in a would be Competitive Business; provided, that nothing herein shall prohibit the Employee from being, directly or indirectly, a passive owner of not more than 2% of the outstanding stock of any class of a corporation which is publicly traded so long as the Employee does not have any active participation in the business of such corporation. "Competitive Business" means any business enterprise, other than the Company and its affiliates, that is engaged in (a) the business of supplying and distributing building materials, including, without limitation, drywall, insulation (including glass fiber, fiberglass blowing wool and fiberglass batts, mineral wool, and cellulose used in interiors applications in residential and commercial construction), ceiling tiles and grid, **metal track and studs**, exterior insulation finish systems, doors, frames and hardware, lumber, fasteners and adhesives, tools, and other related products, and providing related services, (b) any other business conducted by the Company or the Company's affiliates as of the Date of Termination, as such business may be extended or expanded as contemplated by the strategic plan of the Company or any of its affiliates as of the Date of Termination, including, without limitation, entities such as GMS, US LBM, Rosen, Feldman Lumber, ABC Supply-L&W Supply, Kamco, Rew, INEX, Service Partners, Insulation Distributors Inc (IDI), Installed Building Products (IBP), or independent ventures that operate wholly or partially in that business; provided however, Employee may become an employee of a roofing, concrete or paving business so long as 1) such business is not a Competitive Business; 2) such employment does not begin within six (6) months of the Effective Date of this Agreement; and 3) Employee continues to comply with all confidentiality, non-solicit of Employee, and non-solicit of Customer obligations, specifically including those in 4(a)-(d). This Paragraph 4(e) does not affect any other non-competition agreements entered into by the Employee with the Company.

19. While negotiating the terms of his Employment Agreement with FBM, Bowser negotiated the exception to the non-compete in Paragraph 4(e) that permits him to work for a roofing, concrete, or paving business 6 months after the termination of his employment with FBM. Bowser had a friend who is an attorney review the Employment Agreement for him before he signed it.

20. Bowser expressly acknowledged in the Employment Agreement that irreparable damage would result to FBM in the event Bowser breached any of the restrictive covenants therein. *See* Ex. 3, ¶ 4(g).

21. Bowser also explicitly acknowledged that he "carefully read and considered all of the terms and conditions of the Agreement, including the restraints imposed upon [him]" in Paragraph 4; agreed that "each of the restraints contained [therein were] necessary for the protection of the goodwill, Confidential Information and other legitimate interests of [FBM]"; and that each and every one of these restraints, individually or in the aggregate, will not prevent [him] from obtaining other suitable employment during the period in which Employee is bound by such restraints." *See* Ex. 3, ¶ 4(g).

**F. Bowser's Relationships with Significant FBM Customers**

22. As the Nashville Sales Manager of FBM, Bowser was responsible for overseeing and supervising five Outside Sales Representatives covering what FBM calls the "Nashville Metro Area" consisting of the two FBM Branches in Nashville and the Branch in Murfreesboro. The Nashville Metro Area accounted for approximately 75% of all FBM sales revenue in the state of Tennessee in 2023. Bowser was responsible for both maintaining relationships with key influencers of assigned contractors and also recruiting and managing the sales staff. Bowser monitored sales performance, assisted sales representatives with developing and maintaining relationships, and negotiated and closed deals. Bowser was also responsible for preparing and reviewing periodic sales reports showing sales volume, potential sales, and areas of proposed client base expansion with the Branch Manager.

23. Within the Nashville Metro Area, Bowser, through his five Outside Sales Representatives, was responsible for managing roughly 750 active accounts that accounted for an

estimated annual revenue of $75 million. Of those 750 active accounts, Bowser personally serviced four major accounts that FBM acquired as part of the A&D acquisition. Those four major accounts alone generate an estimated $10 million in annual revenue for FBM. Bowser acted as the "face of the company" for those four major accounts that he had also serviced while working for FBM's predecessor, A&D. Bowser also personally participated in meetings between the Outside Sales Representatives and their primary account representatives.

**G. Bowser's Unfettered Access to all of FBM's Confidential Information**

24. Furthermore, FBM provided Bowser, as the Nashville Sales Manager, with unfettered access to substantial confidential and proprietary information systems of FBM with respect to FBM's business throughout the state of Tennessee, including "PowerBI" (a business intelligence tool), its Microsoft Dynamics CRM (customer relationship management software tool), and "Infor" (the company's Enterprise Resource Planning software tool). PowerBI maintains reams of company information regarding sales, pricing, margin, volume, operating expenses, capital expenses, and profitability. Microsoft Dynamics CRM captures sensitive sales representative data regarding customers and their contacts, backlog, revenue, margin tolerance, prior orders, and business forecasting as well as sales leads. Infor maintains private information regarding company inventory, vendor costs, customer pricing, and marketing techniques. Bowser was literally provided the keys to the storeroom in terms of FBM's confidential business information.

25. FBM has gone to great lengths to maintain the secrecy of its confidential and proprietary information, such as its business practices and strategies, and its business strategies and practices derive independent economic value from not being generally known. Corporate information is password protected, including emails and databases, with limited access depending

on an employee's role within the organization. Depending on the equipment being used to log in, two-factor authentication is generally required to log on to FBM's network.

## H. FBM Offers Bowser a Promotion

26. In July 2024, Bowser also requested that FBM promote him and increase his compensation. After some negotiations with Bowser regarding such request, FBM agreed to promote Bowser and scheduled a meeting to finalize the promotion (the "Promotion Meeting") on Monday morning, July 22, 2024, at 9:00 a.m. FBM anticipated promoting Bowser to District Operations Manager TN/MS—a position in which Bowser would have been responsible for an additional six FBM branches with a corresponding increase in quarterly operating income.

## I. Ironline's Efforts to Induce Bowser to Join Ironline, Persuade him of the Restrictive Covenants' Alleged Unenforceability in his Employment Agreement, and Ironline's Offer of Employment

27. FBM has learned that on July 16, 2024, Bowser had dinner with Sebastian Higdon, the President of Ironline, and Brad Pierce, an employee of Ironline. Pierce is a former FBM employee who resigned from FBM in February 2024 to work at Ironline. At that dinner, the three discussed Bowser leaving his employment with FBM to work for Ironline and the opportunities available at Ironline. The three men discussed the fact that Ironline, which traditionally had only offered metal studs for drywall but not the drywall itself, was getting into the drywall market in Nashville. Pierce and Higdon expressly discussed with Bowser his non-compete agreement with FBM and opined that it was unenforceable.[1]

---

[1] Pierce had a non-compete with FBM similar to that of Bowser but Pierce was not in a customer forward facing position like Bowser. Ironline hired Pierce and filed a lawsuit in California on his behalf against FBM seeking a declaration that his non-compete with FBM was unenforceable under California law, despite Pierce having signed his agreement with FBM in Tennessee and having worked only in Nashville for FBM. The parties resolved that case.

28. Sometime between July 17 and 19, 2024, Bowser provided to Pierce and Higdon a copy of his Employment Agreement with FBM containing the restrictive covenants. Appearing to anticipate litigation, Pierce notified Bowser that Ironline would provide him with legal counsel.

29. On July 18 or 19, 2024, Bowser received a letter from Pierce via email offering him employment with Ironline. Bowser discussed the offer with Pierce and advised him he needed to consider it. Bowser did not tell anyone at FBM that he was considering taking a job at Ironline.

30. On Friday, July 19, 2024, Bowser began accessing the six-month sales reports for each of the sales representatives that he supervised and met with them as part of a budgeting process for FBM. In these meetings with the sales representatives, Bowser and Chris Glasco ("Glasco"), a FBM District Sales Manager, did a "deep dive" with the sales representative on each customer to understand how that customer's relationship with FBM was faring and how much business that customer was likely to do for the rest of the year.

31. On Saturday, July 20, 2024, Ben Fultz, an attorney with Fultz Maddox Dickens PLC, contacted Bowser upon Ironline's request. At the time, Fultz represented Ironline. Fultz suggested to Bowser that he would represent him also. Fultz told Bowser on July 20 that his non-solicit agreement with FBM was not enforceable. Bowser signed an employment agreement with Ironline on July 22, 2024 with the understanding, based on his conversation with Fultz, that his non-compete with FBM was not enforceable. When Bowser previously signed his Employment Agreement that contained non-compete and non-solicit obligations to FBM in October 2023, he intended to honor those covenants. Fultz advised Bowser on July 20, 2024 of the possibility of filing an action in California seeking a declaratory judgment that Bowser's non-compete with FBM is unenforceable under California law, even though Bowser signed his agreement with FBM in Tennessee, worked for FBM in Tennessee, lived in Tennessee, and the Employment Agreement

contained a Tennessee choice of law provision. Only after receiving assurances from Ironline that his non-compete with FBM was unenforceable did Bowser leave FBM and join Ironline.

### J. Bowser Skips the Promotion Meeting Under False Pretenses and, Aided by Ironline, Surreptitiously Sues FBM in California Seeking to Void His Non-Compete Agreement in Tennessee, Having Negotiated a Job Offer with Ironline

32. Later on Saturday, July 20, 2024, Bowser called Brendan Nair, Southeast Regional Vice-President-Ops for FBM, and declared that his father-in-law was ill and that he needed to attend to him with his wife. As a result, Bowser indicated that he would be unable to attend the meeting regarding his promotion on the following Monday, July 22, and asked that such meeting be canceled.

33. On July 22, 2024, Bowser began opening a number of documents containing confidential information belonging to FBM. Bowser opened a document with detailed information regarding an FBM project with a significant client in Nashville that included the prices charged to the client and FBM's total profit. Bowser also opened a document that included the identities and contact information for key players across the country for a client for whom Bowser had been designated by FBM as the primary point of contact.

34. On July 22, 2024, Fultz assisted Bowser in preparing his resignation letter to FBM in which he stated that he was providing thirty days notice of his termination to FBM. That same day, Bowser signed the offer letter from Ironline which stated that Bowser would begin working for Ironline nine (9) days later on August 1, 2024. The offer later stated that Bowser's "major initial focus areas" for Ironline would be as follows:

> Develop and maintain relationships with existing customers.
> Prospect for new business opportunities
> Provide customers with product information, technical assistance and product pricing.
> Meet sales targets and objectives.
> Collaborate with other sales team members and management to develop sales strategies.

35. On July 22, 2024, FBM was notified by various California law firms that Bowser had filed a lawsuit in Superior Court for Orange County, California, seeking a declaratory judgment that his Non-Compete Agreement was not enforceable although the case had not yet been docketed ("the California Lawsuit"). *See* Ex. 4, Bowser's Complaint and Request for Declaratory Relief, Superior Court for the State of California, County of Orange. The California Lawsuit also indicated that Bowser had received a job offer from Ironline. *Id.* at ¶¶ 5 and 24.[2]

36. Jordon Anderson and Brendan Nair contacted Bowser later that same day and asked if he had filed the California Lawsuit. Bowser admitted having done so and immediately resigned his position despite his Employment Agreement requiring a written notice 30 days in advance of such resignation. Bowser also indicated that he was going to work for Ironline. At 7:50 p.m. on July 22, 2024, Bowser emailed a revised resignation letter to Anderson, also prepared by Fultz, in which Bowser confirmed his immediate resignation. Bowser also asserted in the letter that Anderson and Nair had waived his 30-day notice obligation. In fact, Anderson and Nair had not waived Bowser's 30-day notice obligation.

37. Bowser represents in the California Lawsuit that Ironline is a Competitive Business as defined in the Covenant Not to Compete.

38. Bowser's employment with Ironline began on July 23, 2024, one day after his employment with FBM ended.

39. Bowser immediately began soliciting business on behalf of Ironline. Bowser posted on LinkedIn that he is the "Sales Manager/Nashville Metropolitan Area" at "Ironline

---

[2] The California Lawsuit was removed to the United States District Court, Central District of California, Case No. 8:24-cv-01643-DOC-SK.

Metals" in Nashville, Tennessee. *See* Ex. 5, LinkedIn, Robert Bowser (https://www.linkedin.com/in/robert-bowser-8a021a132/) (last accessed November 1, 2024).

40. Bowser was contacted by Buddy Coe at Bennett's Contracting about a job and Bowser directed him to Brad Pierce at Ironline.

41. A significant FBM client who moved its work to FBM when Bowser began working at FBM, informed Glasco that they would be moving their work to Ironline and that their understanding was that Bowser would be handling their work.

42. Bowser's current employment is in direct violation of his non-compete and non-solicit obligations owed to FBM.

43. Bowser's Employment Agreement with FBM includes an arbitration provision for all claims arising out of or relating to the Employment Agreement, the employment relationship between Bowser and FBM, or the termination thereof, with a permissive carveout for a party seeking equitable relief, including injunctive relief.

44. FBM filed a lawsuit in the federal district court for the Middle District of Tennessee seeking an injunction against Bowser violating his restrictive covenants with FBM in the Employment Agreement (the "Tennessee Lawsuit").

45. The district court judge in the California Lawsuit transferred that case to the Middle District of Tennessee, finding: (a) Tennessee law governs the Employment Agreement, including its restrictive covenants; (b) the Employment Agreement was negotiated and executed in Tennessee; and (c) that the Central District of California "has no particular interest in the parties because Plaintiff is a resident of Tennessee, his relevant employment occurred in Tennessee, and he plans to continue to live and work in Tennessee. This District is not the primary residence of Plaintiff, as he has been, and remains, a resident of Tennessee. The subject matter of the litigation

is not substantially connected to California. The litigation revolves around Plaintiff's Employment Agreement and the restrictive covenants therein as they relate to employment in Tennessee," whereas "Tennessee courts have a strong interest in adjudicating employment contracts for services in Tennessee by Tennessee residents." The California Lawsuit has been consolidated with the Tennessee Lawsuit.

46. FBM has incurred significant attorney's fees in seeking an injunction requiring Bowser to comply with his Restrictive Covenants with FBM.

## CAUSES OF ACTION

### COUNT I
### TORTIOUS INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

47. FBM incorporates the foregoing paragraphs as if they were set forth herein.

48. Bowser has a valid, enforceable Employment Agreement with FBM.

49. Ironline had actual knowledge of the FBM Employment Agreement, having been provided a copy of it by Bowser and substantively discussing it with him prior to offering him a position at Ironline.

50. Ironline intended to induce Bowser's breach of the Employment Agreement by discussing it with him, persuading him of its alleged unenforceability, by providing him counsel to similarly opine, and, via provided counsel, by assisting him in drafting his resignation letter from FBM.

51. Ironline's conduct described herein was conducted maliciously as it intended for Bowser to commence employment with it, contrary to the terms of the Employment Agreement, benefitting Ironline at the expense of FBM.

52. Bowser has breached his Employment Agreement by means of his employment with Ironline and by soliciting FBM clients on behalf of Ironline.

53. Ironline's inducement for Bowser to commence employment with Ironline was the proximate cause of the breach because, as testified to by Bowser, Bowser would not have resigned from FBM and commenced employment with Ironline without Ironline's persuading him that the restrictive covenants in the Employment Agreement were unenforceable.

54. FBM has been and will continue to be harmed by Bowser's failure to honor the terms of his Employment Agreement. One or more of FBM's clients have indicated that they intend to move their business to Ironline as a result of Bowser's employment at Ironline. Furthermore, FBM has incurred significant attorneys' fees in its effort to enforce the restrictive covenants in the Employment Agreement against Bowser which Ironline told Bowser were unenforceable.

55. FBM also seeks a permanent injunction prohibiting Ironline from interfering with the Employment Agreement between FBM and Bowser.

**COUNT II**
**UNLAWFUL PROCUREMENT OF BREACH OF CONTRACT**
**Tenn. Code Ann. § 47-50-109**

56. FBM incorporates the foregoing paragraphs as if they were set forth herein.

57. Bowser has a valid, enforceable Employment Agreement with FBM.

58. Ironline had actual knowledge of the Employment Agreement, having been provided a copy of it by Bowser and substantively discussing it with him.

59. Ironline intended to induce Bowser's breach of the Employment Agreement by discussing its alleged unenforceability with him, by providing him counsel to similarly opine, and, via provided counsel, by assisting him in drafting his resignation letter from FBM.

60. Ironline's conduct described herein was conducted maliciously as it intended for Bowser to commence employment with it, contrary to the terms of the Employment Agreement, benefitting Ironline at the expense of FBM.

61. Bowser has breached his Employment Agreement by means of his employment with Ironline and by soliciting FBM clients on behalf of Ironline.

62. Ironline's inducement for Bowser to commence employment with Ironline was the proximate cause of the breach because, as testified to by Bowser, Bowser would not have resigned from FBM and commenced employment with Ironline without Ironline's persuading him that the restrictive covenants in the Employment Agreement were unenforceable.

63. FBM has been and will continue to be harmed by Bowser's failure to honor the terms of his Employment Agreement. One or more of FBM's clients have indicated that they intend to move their business to Ironline as a result of Bowser's employment at Ironline. Furthermore, FBM has incurred significant attorneys' fees in its effort to enforce the restrictive covenants in the Employment Agreement against Bowser which Ironline told Bowser were unenforceable.

64. FBM also seeks a permanent injunction prohibiting Ironline from interfering with the Employment Agreement between FBM and Bowser.

## PRAYER FOR RELIEF

**WHEREFORE**, FBM respectfully requests that this Court grant it the following relief:

1. The entry of an Order against Ironline awarding FBM the full extent of damages available to it under applicable law, the amount of which to be determined at trial.

2. That FBM be awarded a permanent injunction prohibiting Ironline from interfering with the Employment Agreement between FBM and Bowser.

3. That FBM be awarded the costs of this action and its attorneys' fees to the extent provided by law.

Dated this 21st day of November, 2024.

Respectfully submitted,

*s/ Robert W. Horton*
Robert W. Horton (TN BPR# 017417)
Ashley R. Li (TN BPR# 039075)
**BASS, BERRY & SIMS PLC**
150 Third Ave. South, Suite 2800
Nashville, Tennessee 37201
Telephone: (615) 742-6200
Facsimile: (615) 742-6293
bhorton@bassberry.com
ashley.li@bassberry.com

*Counsel for Plaintiff*

45973840.14

IRONLINE

# Combining Quality, Innovation & Service

*Ironline is a privately owned company dedicated to being your one-stop shop for quality roll-formed steel framing.*



E-FILED
11/21/2024 3:50 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.





Exhibit 1



*At Ironline, we rely on our 100-plus years of industry knowledge on our leadership team to deliver quality products on time at competitive rates. With each order, our goal is to cultivate relationships with customers who rely on us to meet their cold-formed steel needs.*



*Each and every time, we start with raw materials of the highest quality and use innovative roll-forming technologies to manufacture steel with precision and to the most stringent tolerances. Our line of products - which currently includes steel studs, metal deck, fasteners and ties/clips - is also constantly expanding as we respond to our customers' needs and help navigate the challenges of purchasing materials.*

## INTEGRITY

*We build long-term relationships with customers by providing quality products at fair prices.*

## RELIABILITY

*We deliver sound steel on time and are responsive to our customers’ needs by expanding our line of products continually.*

## PASSION

*We are unwavering in our commitment to quality, customer service and innovation.*

# Ironline’s precision

## manufacturing process yields products that meet the highest standards for performance and quality.

READ MORE



## SUBMITTAL BUILDER

*Create a submittal package for your project today with Ironline's Submittal Builder tool.*

CREATE A SUBMITTAL

# GET IN TOUCH

*Contact us today to discuss how Ironline can be your one-stop shop for cold-formed steel.*

CONTACT US

*Or Call*
***(800) 308-5673***

IRONLINE

*(800) 308-5673*

*info@ironlinemetals.com*

*LinkedIn*

*39 Jinks Street*
*Yemassee, SC 29945*

SFIA MEMBER

©2023 Ironline, LLC. All rights reserved.

# EMPLOYMENT AGREEMENT

## [Sales or Management Personnel]

THIS AGREEMENT ("Agreement") is made effective December 16, 2019 (the "Effective Date"), by and between A&D Supply of Nashville, LLC an Oklahoma limited liability company (the "Company"), and Bob Bowser, an individual ("Employee").

Recitals: The Company is in the business of selling building materials, components, and supplies (the "Business"). The Employee is employed by the Company, or will be employed by the Company upon the execution of this Agreement, in a position which will include sales and/or management duties. The Employee, if currently employed has, or if first employed by this Agreement will have, extensive knowledge and expertise relating to the business affairs of the Company, including without limitation, training, financial information, customers, customer information, customer preferences, processes, systems, pricing, suppliers, methodology, and business plans. As a result, the Employee's experience and knowledge is of value to the Company. The Company desires to employ or continue to employ the Employee, and the Employee desires to provide services to the Company on the terms and conditions set forth herein.

Now therefore, in consideration of the mutual covenants contained herein, the continued employment of Employee, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. Employment. The Company shall employ Employee and Employee hereby accepts (or continues) employment with the Company, upon the terms and conditions set forth in this Agreement for the period beginning on the Effective Date hereof and ending as provided in paragraph 4 hereof (the "Employment Period"). **EMPLOYEE ACKNOWLEDGES THAT THE EMPLOYMENT RELATIONSHIP OF EMPLOYEE AND COMPANY IS AT WILL.** Except as provided in this Agreement, the Employee shall be subject to the terms of the Company's policies and procedures as set forth in the Employee Handbook, as such may be amended from time to time by the Company. To the extent of any conflict between the Employee Handbook and this Agreement, the terms of this Agreement shall control. All prior agreements between the Company and Employee, if any, are hereby terminated.

2. Position and Duties. During the Employment Period, Employee shall devote full time and attention to the business of the Company and faithfully and diligently perform all of the duties and services as may be required of Employee for and on behalf of the Company, as may be determined from time to time by the governing body of the Company, subject to their power to alter, restrict, expand, or limit all such duties and responsibilities. Employee shall not engage in any other business activity that is inconsistent with the terms of this Agreement or contrary to the best interests of the Company.

3. Compensation and Benefits.

a. For all services rendered by Employee under this Agreement, the Company shall pay Employee the amount of compensation set forth on Exhibit "A" attached hereto and incorporated herein by reference. The Employee shall be entitled to such benefits as determined by the governing body of the Company in writing or as may be set forth on Exhibit A. Exhibit A may be amended from time to time as

the Company may determine in writing and signed on behalf of the Company by its governing body. All amounts payable to Employee as compensation hereunder shall be subject to customary withholding by the Company as required by federal and state law. All amounts payable to Employee as compensation or benefits to be provided to Employee as set forth in Exhibit A are subject to change or elimination by the Company effective on written notice.

b. The Incentive Plan, attached hereto as Exhibit "B" and incorporated herein by reference, shall apply to Employee, according to its terms.

c. Except as otherwise expressly provided herein, all of Employee's rights to compensation or benefits hereunder which accrue or become payable after the termination or expiration of the Employment Period shall cease upon such termination or expiration, other than those expressly required under COBRA. Upon the termination of this Agreement, the Employee shall not be entitled to compensation or payment for unused vacation time or sick leave.

d. The Company shall have the right to apply for and own, pay for and be the beneficiary of one or more policies of life insurance on the life of Employee. Employee shall fully cooperate with the Company in connection with any such life insurance to be obtained, including the taking of any exams required by the issuing insurance company and providing of all written information necessary.

4. Term. The Employment Period shall commence upon the Effective Date of this Agreement and shall continue until the earliest of any of the following events: (i) Employee's resignation or death, or (ii) the Employment Period may be terminated by the Company or Employee for any reason and with or without cause or for convenience at any time.

5. Confidential Information.

a. Employee acknowledges that the information, observations, and data (including trade or business secrets) obtained or prepared by Employee or which Employee has access to while employed by the Company at any time (and whether existing prior to or after the date hereof) concerning the business or affairs of the Company and its parent and subsidiary entities, affiliates, owners, managers, members, officers and directors (the "Confidential Information" as further defined below) is the exclusive property of the Company, is to be used solely for the business purposes of the Company, and is vital to the goodwill and other protectable interests of the Company. Employee agrees both during Employee's employment, after any cessation of Employee's employment with Company and thereafter for the longest period of time permitted by law, not to disclose to any third party, or use for Employee's own purposes, or remove from the Company facilities, or in any manner cause to be transferred to any personal email account of the Employee or another, or cause to be uploaded to any personal computer or Cloud account of the Employee or another, any Confidential Information without the prior written consent of the Company and solely for the Company business. Employee shall deliver to the Company at the cessation of employment, or at any other time the Company may request, all documents, materials, data, or physical property (and all copies thereof) embodying or relating to the Confidential Information or the business of the Company which Employee may then possess or have under Employee's control, in whatever form maintained. Employee agrees to immediately notify the Company in writing at its notice address below of any unauthorized use, disclosure, transmission, or loss of the Confidential Information.

b. Confidential Information shall include, but not be limited to, data or information regarding the following: all information or material that has or could have commercial value or other utility in the business in which the Company is engaged (and whether reduced to writing or not); trade or business

secrets; business, sales and marketing plans or strategies; expansion plans; financial information; customers, customer lists and prospective customers; suppliers, purchase orders and deliveries, product costs, bid proposals and RFQ's; research and development; methods of doing business and business processes; inventory, pricing; photos and other copyrightable material (whether formally copyrighted or not); Work Product (as defined below); information received from third parties under confidential conditions; business contracts and requirements; information regarding suppliers, employees and contractors and compensation paid; software and passwords/codes to IT systems; tax, financial, banking, HR or compensation information of any employee, or any officer, director, owner, manager or member of the Company; the existence or terms of the Incentive Plan attached hereto as Exhibit B; banking and bank accounts and passwords/logins; and any information that is marked as "confidential" or "proprietary" by any means. Confidential Information includes that which is furnished or made available or accessible in any tangible or intangible form, including, but not limited to, writings, drawings, computer tapes, other electronic media or means, samples, verbal communications, and visual means.

c. Immunity under the Defend Trade Secrets Act of 2016. The federal Defend Trade Secrets Act of 2016 provides immunity in certain circumstances to Company employees, contractors, and consultants for limited disclosures of Company trade secrets. Specifically, Company employees, contractors, and consultants may disclose trade secrets (1) in confidence, either directly or indirectly, to a federal, state or local government official, or to an attorney, "solely for the purpose of reporting or investigating a suspected violation of law," or (2) "in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal." Additionally, Company employees, contractors, and consultants who file retaliation lawsuits for reporting a suspected violation of law may also use and disclose related trade secrets in the following manner (1) the individual may disclose the trade secret to his/her attorney, and (2) the individual may use the information in related court proceedings, as long as the individual files documents containing the trade secret under seal and does not otherwise disclose the trade secret "except pursuant to court order."

6. Inventions and Patents. Employee acknowledges that all inventions, innovations, improvements, developments, methods, designs, analyses, drawings, reports, and all similar or related information (whether or, not patentable) which relate to the Company's actual or anticipated business, research, and development or existing or future products or services and which are conceived, developed, or made in whole or part by Employee while employed by the Company ("Work Product") belong solely to the Company. Employee shall promptly disclose such Work Product to the Company and, at the Company's expense, perform all actions reasonably requested by the Company (whether during or after the Employment Period) to establish and confirm such ownership (including, without limitation, executing any assignments, consents, powers of attorney and other instruments).

7. Non-Competition. Employee agrees that during the Employment Period and for the longer of (i) eighteen (18) months after the termination or expiration thereof for any reason, or (ii) the full period of time over which the Company is paying any amounts to Employee pursuant to the Incentive Plan attached as Exhibit B hereto, plus twelve (12) months thereafter (the "Non-Competition Period"), Employee will not, directly or indirectly, compete with the Company by providing Goods and Services to any person or entity within a twenty-five (25) mile radius of the Company's principal place of business in Nashville, Tennessee. For purposes of this paragraph 7, "Goods and Services" are those that were provided by Company to its customers at any point during the last year of Employee's employment with Company. Employee expressly agrees the provisions of this paragraph are reasonable, will not work any undue hardship on Employee, and will not keep Employee from earning a living.

8. Non-Solicitation and Non-Interference. Employee agrees that, during the Employment Period, and for the longer of (i) two (2) years after the termination or expiration thereof for any reason, or (ii) the full period of time over which the Company is paying any amounts to Employee pursuant to the Incentive Plan attached as Exhibit B hereto plus twelve (12) months thereafter (the "Non-solicitation Period"), Employee shall not, directly or indirectly, actively or inactively,

(i) solicit anyone who is a current employee or independent contractor or who was an employee or independent contractor of the Company during the twelve (12) months prior to the termination of the Employee's employment for any reason to become an employee or independent contractor of employee or another person or business;

(ii) solicit the sale of Goods and Services, or provide Goods, Services, or a combination of Goods and Services that would compete with the Business of Company, as of the date of termination of Employee's employment, to or from any customers of the Company with whom Employee had business-related contact or communications, obtained Confidential Information, worked with, performed services for, or worked on their account on behalf of Company, or with respect to whom the Employee had responsibility to seek business from on behalf of the Company, including prospective customers, during the twenty-four (24) months prior to the termination of the Employee's employment for any reason. Employee expressly agrees the provisions of this paragraph are reasonable, will not work any undue hardship on Employee, and will not keep Employee from earning a living; or

(iii) in any capacity, on behalf of Employee or any other person or entity, influence or attempt to influence any customer, independent contractor, vendor, supplier, entity, or person who or which has had a business, contractual, or employment relationship with the Company at any time during the twenty-four (24) months prior to the termination of the Employee's employment for any reason to divert, direct, or transfer any business, service, opportunity, or patronage away from Company or to otherwise reduce or limit any business, service, opportunity, or patronage of Company with them.

9. Tolling. If Employee violates the restrictions in paragraphs 7 and 8, Employee agrees to an extension of such covenants and restrictions on the same terms and conditions for an additional period equal to the time that elapses from the commencement of such violation to the later of (a) the termination of such violation; or (b) the final resolution of any litigation stemming from such violation.

10. Non-Disparagement; Notice to New Employer. After the termination of Employee's employment for any reason, Employee will not publish, orally or in writing, any derogatory information tending to defame or malign, or in fact defaming or maligning the Company, its owners, officers, directors, managers, members, employees, independent contractors, or customers. Employee agrees that Company may give notice to any new employer of Employee of the terms of this Agreement.

11. Enforcement.

a. If at the time of enforcement of paragraph 5, 6, 7 or 8 a court shall hold that the restrictions stated therein are not enforceable for any reason, the parties agree that the maximum duration and scope under such circumstances shall be substituted for the stated duration and scope and that the court shall be allowed to revise the restrictions contained therein to cover the maximum duration and scope permitted by law.

b. Because Employee's services are unique and because Employee has access to Confidential Information and Work Product, the parties hereto agree that money damages would not be an adequate remedy for any breach of this Agreement. Therefore, in the event of the breach or a threatened breach by Employee of paragraphs 5, 6, 7 or 8 this Agreement, the Company, in addition and supplementary to other rights and remedies existing in its favor, shall be entitled to seek injunctive or other equitable relief from a court of law or equity in order to protect the Company's interests and shall not be required to post an injunction bond in excess of $100.00, which the parties agree is reasonable and adequate bond should the Company seek an injunction to enforce this Agreement.

12. Employee's Representations; Indemnity. Employee hereby represents and warrants to the Company that (i) the execution, delivery, and performance of this Agreement by Employee does not and shall not conflict with, breach, violate, or cause a default under any contract, agreement, instrument, order, judgment, or decree to which Employee is a party or by which Employee is bound, (ii) Employee is not a party to or bound by and will not become a party to or be bound by any employment agreement, non-compete, non-interference, or non-solicitation agreement, or non-disclosure/confidentiality or work product/intellectual property agreement with any other person or entity during the term of this Agreement, (iii) Employee does not have and/or will not bring to or disclose to Company or use for the benefit of the Company or any work performed for the Company in any manner, any confidential or proprietary information, intellectual property, or trade secrets of any former employer , and (iv) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Employee, enforceable in accordance with its terms. To the fullest extent permitted by law, Employee agrees to defend, hold harmless, and indemnify the Company (and its officers, directors, managers, members, employees, and owners, collectively the "Indemnified Parties") from and against any claim, demand, damage, settlement amount, judgment, or loss (including attorney's fees, expenses, and costs and expert witness costs) that the Indemnified Parties may suffer or incur or to which it or they become subject, by reason of, relating to, resulting from, or arising in connection with a breach of this Agreement by Employee or the enforcement of this indemnity obligation, including, but not limited to, any assertion of a claim that is contrary to these representations and warranties by any prior employer or third-party.

13. Miscellaneous. The following provisions shall apply to this Agreement:

a. Survival. The provisions in Paragraphs 5, 6, 7, 8, 9, 10, 11, 12 and 13 shall survive and continue in full force in accordance with their terms notwithstanding the expiration or termination of the Employment Period.

b. Notices. Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, sent by reputable overnight courier service, or mailed by first class mail, return receipt requested, if to the Company at its current address (Attention: George W. Hughes, III) and if to Employee, as the address last set forth in the Company records, or such other address or to the attention of such other person as the recipient party shall have specified by prior written notice to the sending party. Any notice under this Agreement shall be deemed to have been given when so delivered, sent, or mailed.

c. Severability. Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement or any action in any other jurisdiction, and the remainder of this Agreement shall continue in full force and effect.

d. Complete Agreement. This Agreement constitutes the complete agreement and understanding among the parties and supersedes and preempts any prior understandings, agreements, or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. There are no inducements for a party to enter into this Agreement except as set forth herein.

e. No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

f. Counterparts. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

g. Successors and Assigns. This Agreement is intended to be binding upon and inure to the benefit of and be enforceable by Employee, the Company, and their respective heirs, successors, and assigns. Employee may not assign his rights or delegate his duties or obligations hereunder. Company may assign this Agreement.

h. Offset. The Company shall have the right of offset and charge back under this Agreement (including without limitation as to any payments under the Incentive Plan attached as Exhibit B hereto) for any breach of this Agreement by Employee.

i. Choice of Law, Jurisdiction and Venue; Waiver of Jury Trial. The construction, validity, enforcement, and interpretation of this Agreement and any exhibit hereto shall be governed by, and construed in accordance with, the laws of the State of Tennessee. Jurisdiction and venue for any litigation arising under the terms of this Agreement shall lie exclusively in any Federal or State court sitting in a judicial district in Davidson County, Tennessee, and each party hereto waives all defenses to such. Except to the limited extent arising under Paragraph 12, in any litigation, each party shall pay their own attorney fees and costs and expert witness fees and costs and waive all rights to seek attorney fees and costs under all statutory authority, to the fullest extent permitted by law. **THE PARTIES HERETO AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.**

j. Limitation on Damages. Excepting any indemnity obligation of Employee herein, no party hereto shall be liable to the other for consequential, special or punitive damages, but only compensatory damages and injunctive or other equitable relief, including, but not limited to, specific performance.

k. Amendment and Waiver. The provisions of this Agreement may be amended or waived only with the prior written consent of the Company (as approved by its governing body) and Employee, and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall affect the validity, binding effect, or enforceability of this Agreement or be deemed to be an implied waiver of any provision of this Agreement.

1. Recitals Incorporated. The recitals set forth at the beginning of this Agreement are incorporated herein by reference and are contractual in nature and not mere recitals.

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement to be effective the Effective Date.

A&D Supply of Nashville, LLC ("Company")

By: ______________________________
George W. Hughes, III, Manager

"Employee"

______________________________ 2-28-2020
Bob Bowser, an individual

1 Xr

A&D Supply of Nashville, LLC

EXHIBIT "A" TO EMPLOYEMENT AGREEMENT 12/16/2019

| | |
|---|---|
| Employee Name: | Bob Bowser |
| Current Job Title: | General Manager |
| Compensation: | $100,000 Annual Salary first 6 months |
| After 6 months Compensation: | $115,000 Annual Salary |
| Vehicle: | Vehicle allowance of $650.00 per month added to biweekly payroll |
| Phone: | Phone allowance of $100.00 per month |
| Vacation/ Sick: | 2 weeks paid vacation |
| Benefits: | As per company handbook |
| 401K: | As per company handbook |

Employee Signature ______________________
Bob Bowser, General Manager

Manager Signature ______________________
George Hughes III, President

***EXHIBIT B TO EMPLOYMENT AGREEMENT OF BOB BOWSER***

**Incentive Plan - A&D Supply of Nashville, LLC ("Company")**

**Introductory Terms.** The Company has agreed to an Incentive Plan ("Incentive Plan") applicable to Bob Bowser ("Key Employee"), effective for the period commencing January 1, 2020. The Incentive Plan shall consist of two parts, Part 1 being the Incentive Bonus ("Incentive Bonus"), consisting of a Net Profit Bonus and a Sale Bonus, each as provided below, and Part 2 being the Separation Incentive ("Separation Incentive"), consisting of the Voluntary Separation Payment and the Death or Disability Payment, each as provided below.

Each of the Incentive Bonus and the Separation Incentive, and any payment to be made pursuant thereto, is an unfunded, unsecured, general obligation of the Company and is not subject to the Employee Retirement Income Security Act of 1974, as amended (ERISA). To the extent that Key Employee is or becomes entitled to receive any payment pursuant to this Incentive Plan, such right shall be no greater than the right of an unsecured general creditor of the Company and subject to all provisions of this Incentive Plan. Any such payment to be made hereunder shall be paid from the general funds of the Company and no special or separate fund shall be established and no segregation of assets shall be made to assure payment of any such amounts. No part of this Incentive Bonus or Separation Incentive is intended to provide retirement benefits or deferred compensation. Key Employee shall have no right to defer any compensation to be paid by the Company or any payment to be made under or as a result of this Incentive Plan.

Key Employee is highly paid, and is employed by the Company to perform managerial and/or sales duties, that will directly contribute to and drive the financial success of the Company. The primary purpose of this Incentive Plan is to incentivize and reward the Key Employee for the future contribution to the success of the Company and encourage longevity with the Company.

Each of the Incentive Bonus and the Separation Incentive, is further subject to the conditions precedent and all other terms and provisions set forth in this Incentive Plan.

***THIS INCENTIVE PLAN IS NOT A GUARANTEE OF ANY PAYMENT TO KEY EMPLOYEE. THIS INCENTIVE PLAN IS NOT A GUARANTEE OF EMPLOYMENT OR CONTINUED EMPLOYMENT OF KEY EMPLOYEE. KEY EMPLOYEE IS EMPLOYED AT WILL BY THE COMPANY. THIS INCENTIVE PLAN IS CONFIDENTIAL AND SUBJECT TO THE PROVISIONS OF THE EMPLOYMENT AGREEMENT OF KEY EMPLOYEE RELATING TO CONFIDENTIALITY, NONDISCLOSURE, NONCOMPETITION,AND NONSOLICITATION.***

Certain Definitions.

"Bonus Percentage". For purposes of this Incentive Plan, the initial "Bonus Percentage" of Key Employee under this Incentive Plan is 6.66%. The Company currently has 3 total employees that participate in this Incentive Plan, including Key Employee herein. The Company may in its discretion add a fourth employee that will participate in all or part of this Incentive Plan to be effective after determination by the Company. In such event the Bonus Percentage of Key Employee shall automatically change to 5.0% with respect to any of the Net Profit Bonus, Sale Bonus or Separation Incentive that is made then applicable to such fourth employee. In the event that Key Employee, or any other employee of the Company that is then participating in one or more of the Net Profit Bonus, Sale Bonus and/or Separation Incentive, shall at any time cease being employed by the Company for any reason (including without limitation after and in the event a fourth employee is added to participate in any part of this Incentive Plan

as provided above), the Bonus Percentage that would have been applicable to such former employee shall not be reallocated to any other participating employee under any part of this Incentive Plan, but shall instead be retained by the Company.

"Code". Code shall mean the Internal Revenue Code of 1986, as amended.

"GAAP". GAAP shall mean generally accepted accounting principles.

**PART 1- INCENTIVE BONUS**

Net Profit Bonus.

A. The Net Profit Bonus of Key Employee will be based on the Bonus Percentage set forth above in the definition of Bonus Percentage of Company calendar year annual net profit ("ANP") (on a stand-alone basis of the Company and not as a part of Hughes Industries, LLC or its other subsidiaries or affiliates), paid on an estimated calendar quarter basis of calendar quarter net profit ( "QNP"). For this purpose ANP (and QNP on an estimated calendar quarter basis) is defined as gross revenue from operations, less (i) cost of goods sold, (ii) operating expenses (direct and indirect, including but not limited to, salaries and wages, other employee bonuses, rent, utilities, depreciation, professional fees and costs, insurance, overhead, management fees), (iii) interest, (iv) taxes and (vi) all payroll taxes incurred by the Company as its share in connection with payment of the Bonus Percentage of QNP or ANP to Key Employee, all as determined by the Company based on book income (GAAP) as used by the Company.

B. One-half of the Bonus Percentage of QNP calculated by the Company for a calendar quarter will be disbursed to the Key Employee within 75 days following the close of the calendar quarter for which the bonus was calculated as determined by the Company. The Bonus Percentage of ANP, less all prior payments of QNP for the applicable calendar year, will be disbursed to the Key Employee following the close of the calendar year in which the ANP was calculated, within 75 days based on the calculation of ANP by the Company. The payment of the Net Profit Bonus will be less all applicable federal and state withholding obligations.

C. In the event of the applicability of the Sale Bonus or the Separation Incentive below, the Net Profit Bonus will automatically cease and terminate immediately without notice and will not thereafter be applicable or due with respect to any unpaid Net Profit Bonus for any period ended prior to the applicability of the Sale Bonus or Separation Incentive, if any. For this purpose the Sale Bonus shall be suspended as of the date negotiations commence for a Transaction and any Net Profit Bonus that is then unpaid or would otherwise be calculated and payable in the time frame of such negotiations shall not be due or paid pending any closing of the Transaction and if the Transaction is consummated, any suspended amounts will not be due or paid.

D. In all events, if the calculation of ANP or QNP by the Company for any applicable time frame (calendar year or calendar quarter) results in a prior overpayment of the Net Profit Bonus, or if the Company shall have losses based upon the calculation of ANP or QNP, such overpayment and/or losses shall be carried forward indefinitely until fully offset with ANP, as determined on a cumulative basis. In addition the amount of any such losses carried forward shall be offset against the Sale Bonus calculation below of NSP.

E. The Net Profit Bonus is further subject to the conditions precedent and all other terms and provisions set forth in this Incentive Plan.

Sale Bonus.

A. The Sale Bonus is a one-time bonus and will be based on the Bonus Percentage of Key Employee as set forth above in the definition of Bonus Percentage, of Company Net Sales Proceeds ("NSP") as defined below,

from a "Transaction" (as defined below) and is calculated on a stand-alone basis of the Company and not as a part of Hughes Industries, LLC or its other affiliates or subsidiaries. The payment of the Sale Bonus will be less all applicable federal and state withholding and other tax obligations with respect to the Sale Bonus. The Sale Bonus will automatically cease and terminate immediately upon the closing of the Transaction and will not thereafter be applicable, except for the payment of the one-time Sale Bonus to Key Employee as provided herein, if any.

B. A "Transaction" to which the Sale Bonus is applicable is defined as follows: The sale of all or substantially all of the assets and going business of the Company, or the sale of all or more than 80% of the equity membership interest in the Company, in either case to an unrelated third party purchaser ("Purchaser"). The seller in any such Transaction (whether the Company in a sale of assets, or its equity owner in the sale of LLC member interest) is the "Seller" herein, as applicable. A Purchaser shall not include any person or entity that is then an owner of the Company (directly or indirectly) or any affiliate of any of them, nor any person or entity that is then owned, in whole or part, by the Key Employee, directly or indirectly. Thus by way of example and without limitation, the Sale Bonus is not applicable to (i) any sale or transfer of business, assets, stock or cash between the Company and any owner or affiliate of the Company (including Hughes Industries, LLC or its other subsidiaries, or any direct or indirect owners thereof), (ii) any reorganization or restructure of the Company whereby one or more of the then ultimate owners of the Company, directly or indirectly, or an entity controlled by one or more of them, directly or indirectly, continues in control of the Company after such reorganization or restructure, or (iii) the issuance, sale or transfer of a membership or equity interest in the Company to any owner or affiliate of the Company (including Hughes Industries, LLC or its other subsidiaries, or any direct or indirect owners thereof). "Control" for the above purposes means ownership of more than 51% of the outstanding voting interests in the Company.

C. NSP shall be the amount of net cash proceeds only received by the Seller from the Purchaser in the Transaction as allocable to the purchase price of the Company only (or its assets) at the closing of the Transaction, and in any event shall be less or excluding the items allocable below ("Adjustments") as determined by the Company. If the Transaction includes more assets or entities than just the Company, the allocation of such cash received from the Purchaser in a Transaction and Adjustments shall be determined by the Company and based on, to the extent applicable, the valuation methodology used by the Purchaser in the Transaction, or if none or to the extent not applicable, then as determined and allocated by the Company.

NSP shall be determined by the Company and in any event shall be less or excluding therefrom the following Adjustments, without duplication (as determined by the Seller):

(i) the amount of any required reinvestment of cash received by Seller from the Purchaser for the Company (or its assets) into or as part of the continuing entity pursuant to the Transaction shall reduce the NSP;

(ii) the amount of any escrow, holdback or indemnity fund or amount required by the Purchaser pursuant to the Transaction or payments or proceeds therefrom after closing of the Transaction shall not be counted as cash received by Seller until actually paid and released to the Seller, if any, net of any payments required pursuant to the escrow, holdback or any indemnity provisions applicable to Seller relating to the Transaction, however made;

(iii) any payment or distribution for or on account of net working capital (current assets less current liabilities) of the Company as a result of the Transaction is excluded from NSP;

(iv) any earnout calculation or payment to be paid by the Purchaser (or other entity) to the Seller after closing of the Transaction, based on financial results achieved after closing of the Transaction is excluded from NSP;

(v) costs and expenses of the Transaction allocable to the Company, including but not limited to attorney fees and costs, accounting fees, brokerage fees and insurance premiums paid for insurance policies shall reduce NSP;

(vi) the amount of the Company share of federal and state payroll or other taxes paid or to be paid resulting from payment of the Sale Bonus to Key Employee shall reduce NSP;

(vii) debts and other liabilities and obligations of the Company paid or to be paid as part of the closing of the Transaction, including without limitation trade creditors and repayment of any loans or advances to lenders or to Hughes Industries, LLC or its affiliates or owners, directly or indirectly shall reduce NSP;

(viii) severance or other bonus payments to other employees of the Company in connection with the Transaction, if any, including the Company share of state and federal payroll taxes thereon shall reduce NSP;

(ix) amounts to be paid by the Purchaser (or other entity) for services rendered after closing of the Transaction or any equity ownership interest granted or to be received by Seller as a part of the Transaction, relating to the Company or Purchaser, is excluded from NSP;

(x) in the event that the Company shall at any time be taxed as a "C" corporation for federal income tax purposes, rather than as part of an "S" corporation, then the federal and state income taxes allocable to the Company as part of a Transaction that is an asset sale (as determined by the Company) as a result of the Transaction shall reduce NSP;

(xi) any other loss, cost or expense of any kind claimed, incurred, or paid by the Company (including without limitation attorney fees and costs, judgment's, settlement amounts, taxes, fines or otherwise), whether paid at closing of the Transaction or thereafter and however paid, arising from or relating to the Transaction, or arising from or relating to any time period prior to the Transaction, or arising from or relating to any litigation or other dispute that includes the Company or its business as to any time frame, shall reduce NSP;

(xii) any reserve established by the Company or its owners for the satisfaction or payment of any amount set forth in this section C shall reduce NSP, unless and until released from such reserve without payment of amounts for which the reserve was established, and

(xiii) the amount of any losses carried forward under the Net Profit Bonus provisions above shall reduce NSP.

D. Any Sale Bonus that is due to the Key Employee in the event a Transaction occurs will be paid on the later of, within seventy-five (75) days after receipt of the cash payment by Seller pursuant to the Transaction giving rise to the payment due, or when finally determinable, as determined by the Seller, but in any event within seventy-five (75) days following the close of the calendar year in which the receipt of the cash payment pursuant to the Transaction occurred giving rise to the payment due.

E. The Sale Bonus is not applicable, and shall automatically terminate, if at any time the Voluntary Separation Incentive or the Death or Disability Payment is or becomes applicable to Key Employee under the terms thereof.

F. The Sale Bonus is further subject to the conditions precedent and all other terms and provisions set forth in this Incentive Plan.

<u>Condition Precedents Applicable to Net Profit Bonus and Sale Bonus.</u>

A. Each and all of the following condition precedents must be fully and strictly satisfied in order for Key Employee to be eligible under and receive a payment under the Net Profit Bonus or Sale Bonus, as applicable below, and in the event any of the following condition precedents are not fully and strictly satisfied, no payment shall be due or payable:

(i) Key Employee must be employed by the Company on the date of the payment of the Net Profit Bonus in a full-time employee capacity for the Net Profit Bonus to apply and this Incentive Plan must be then in effect for the Net Profit Bonus to apply.

(ii) Key Employee must be employed by the Company on the date of the closing of the Transaction in a full-time employee capacity for the Sale Bonus to apply and this Incentive Plan must be then in effect for the Sale Bonus to apply.

(iii) For the Sale Bonus to apply, if the Purchaser in a Transaction requires that Key Employee enter into an employment agreement and/or a non-solicitation, non-interference, non-competition or non-disclosure/confidentiality agreement as part of the closing of the Transaction, or provide any assurance, representation or warranty regarding the Transaction, or reinvest any of the Sale Bonus in the Purchaser, Company or its successor pursuant to the Transaction, Key Employee shall enter into and perform such agreement as may be required by the Purchaser and the Company and no default thereunder shall have occurred by Key Employee;

(iv) For any Incentive Bonus to apply, Key Employee must be in full compliance with and not have violated the terms of his Employment Agreement with the Company (and if applicable any successor to the Company in a Transaction), the Employee Handbook, and any other written agreement between Key Employee and the Company and if applicable its successor in a Transaction, including without limitation the non-solicitation, non-interference, non-competition, confidentiality and nondisclosure provisions thereof, and no default or breach under such Agreement(s) or documents shall have occurred or be continuing;

(v) For any Incentive Bonus to apply, the Company shall not have filed for relief or protection under any applicable Bankruptcy laws;

(vi) Key Employee shall execute and deliver a complete release of the Company and its owners, officers, directors and managers, in such form as the Company may require for all time periods prior to the date of any payment under the Incentive Bonus.

**PART 2- SEPARATION INCENTIVE**

Voluntary Separation Payment.

In the event Key Employee has been continuously employed by the Company as an employee in a full time capacity for 10 consecutive years and shall after that time while still so employed by the Company give written notice to Company of the voluntary cessation of his employment ("VS Notice"), Company will pay a lump sum amount as a Voluntary Separation Payment to Key Employee, to be calculated and paid as set forth below:

The Voluntary Separation payment shall be calculated by the Company as follows: 4 times the annualized average 36 month trailing EBITDA (earnings before interest, taxes, depreciation and amortization) of the Company on a stand-alone basis (excluding Hughes Industries, LLC or its other subsidiaries or affiliates), multiplied by the Bonus Percentage of Key Employee, as determined by the Company based on book income (GAAP) as used by the Company. For example, if the average 12 month EBITDA for the prior 36 months is One Million Dollars, the Voluntary Separation payment would be calculated as 4 times one million dollars (4 million dollars) multiplied by the Bonus Percentage of Key Employee (assuming 6.66%), equal $266,400.00 as the Voluntary Separation payment.

The Voluntary Separation Payment shall be paid by the Company to Key Employee (or his legal representative) in five (5) equal payments over five years, with the first payment to be made within 180 days following applicability

of the Voluntary Separation Payment and the next four (4) payments to be made on the anniversary dates of the initial payment. No interest shall be due or payable on the Voluntary Separation Payment.

Death or Disability Payment.

In the event Key Employee has been continuously employed by the Company as an employee in a full time capacity for 7 consecutive years, and after that time the employment of Key Employee shall cease due to the "death" or "disability" (as defined below) of Key Employee at a time while still so employed as an employee of the Company, Company will pay a lump sum amount to Key Employee (or his legal representative) to be calculated and paid as set forth below:

The Death or Disability Payment shall be calculated by the Company as follows: 4 times the annualized average 36 month trailing EBITDA (earnings before interest, taxes, depreciation and amortization) of the Company on a stand-alone basis (excluding Hughes Industries, LLC or its other subsidiaries or affiliates), multiplied by the Bonus Percentage of Key Employee, as determined by the Company, as determined by the Company based on book income (GAAP) as used by the Company. See above example.

The Death or Disability Payment shall be paid by the Company to Key Employee (or his legal representative) in five (5) equal payments over five years, with the first payment to be made within 180 days following applicability of the Death or Disability Payment and the next four (4) payments to be made on the anniversary dates of the initial payment. No interest shall be due or payable on the Death of Disability Payment.

The term "death" shall mean the death of the Key Employee as confirmed by a death certificate issued by a competent state agency, and with written notice to the Company ("Death Notice").

The term "disability" shall mean the Key Employee is: (a) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than twelve (12) months as evidenced by a letter issued by two competent independent practicing licensed physicians in the State of Tennessee; or (b) is determined to be totally disabled by the Social Security Administration, in each such case with written notice to the Company ("Disability Notice").

Conditions Precedent to Voluntary Separation Payment and Death or Disability Payment.

A. Each and all of the following condition precedents must be fully and strictly satisfied in order for Key Employee to be eligible under and receive a payment under the Voluntary Separation Payment or Death or Disability Payment, as applicable below, and in the event any of the following condition precedents are not fully and strictly satisfied, no payment shall be due or payable:

(i) Key Employee must be a full time employee of the Company on the date the VS Notice is received by the Company.

(ii) Key Employee must be a full time employee of the Company on the date of the death of Key Employee or the date the notice of disability of Key Employee is received by the Company.

(iii) The Voluntary Separation Incentive and the Death or Disability Payment is not applicable, and shall automatically terminate, if at any time the Sale Bonus under the Incentive Bonus was, is, or becomes applicable to Key Employee prior to the applicability of the Voluntary Separation Incentive or the Death or Disability Payment.

(iv) In order for the Voluntary Separation Incentive or the Death or Disability Payment to apply, Key Employee must be in full compliance with all terms of his Employment Agreement with the Company (and any other written

agreement between Key Employee and the Company) and no default under such Agreement(s) shall have occurred or be continuing;

(v) In order for the Voluntary Separation Incentive or the Death or Disability Payment to apply, the Company shall not have filed for relief or protection under any applicable Bankruptcy laws;

(vi) In order to receive any payment under the Voluntary Separation Incentive or the Death or Disability Payment, Key Employee (or his legal representative) shall execute and deliver a complete release of the Company and its owners, officers, directors and managers, in such form as the Company may require for all time periods prior to the date of payment.

(vii) This Incentive Plan for the Separation Incentive must be in effect on the date of the Death Notice or Disability Notice, as applicable.

Other Terms and Provisions Applicable to the Incentive Bonus and Separation Incentive. In addition to the Conditions Precedent applicable to each of the Incentive Bonus and Separation Incentive, all of the following terms and provisions shall apply:

A. Nothing in this Incentive Bonus or Separation Incentive shall: (i) prohibit or restrict, the transfer or lending, or distribution of assets, property or cash, or payment of management fees, or leasing of any assets, between Company and Hughes Industries, LLC or any of its other subsidiaries or affiliates, or (ii) prohibit or restrict the conduct of any business or other transaction of the Company or any other business decision of the Company, or (iii) prohibit or restrict the liquidation, dissolution or cessation of business by the Company, or (iv) prohibit or restrict the formation of other business entities in the State of Tennessee or elsewhere, and even if competing with the Company for business, or (v) create any trust or any fiduciary duty to or relationship with Key Employee, or (vi) create or result in any lien or security of any kind (legal or equitable) in favor of Key Employee, including without limitation as a result of any payment or amount due to Key Employee under this Incentive Plan, or (vii) create any duty or obligation on the part of the ownership of the Company to fund (in any manner, including loans, capital contributions or otherwise or any guarantee thereof) the business, operations or expenses of the Company. In all events the Company shall run its business and make such business decisions as it determines to be in its best interest and in the best interest of its ownership, without regard to the impact on this Incentive Plan. Nothing in this Incentive Plan constitutes or shall constitute ownership of a stock, LLC, partnership or other equity ownership interest in the Company by Key Employee.

B. The Incentive Bonus and Separation Incentive is not a guarantee of any amount to be paid, or that any amount will be paid, based on the calculations thereof as set forth herein. Under no circumstances shall the Company be obligated to pay to Key Employee more than one payment of either the Sale Bonus, Separation Incentive or Death or Disability Payment.

C. Key Employee understands that all amounts paid under the Incentive Bonus and the Separation Incentive will be W-2 ordinary income to Key Employee and subject to federal and state withholding, all of which shall be borne by Key Employee. Any taxes due under Code Section 409A, if any, shall be paid and borne solely by Key Employee.

D. This Incentive Plan document contains all of the complete terms of the Incentive Bonus and Separation Incentive and supersedes any prior discussions or writings. The Company shall have the right to interpret, apply and clarify, as necessary (including by amendments hereto) this Incentive Plan. The Company may adopt rules and regulations regarding the administration of this Incentive Plan and procedures and methods for construing and interpreting this Incentive Plan. The Incentive Plan and its terms and all calculations and determinations with respect thereto, will be applied and determined solely by the Company in a consistent manner and such determinations will be binding and conclusive on Key Employee. The decisions of the Company in connection with this Incentive Plan shall be given the maximum deference permitted by law. The Company shall further have the right to amend this Incentive

Plan as necessary in order to comply with applicable laws in effect at any time, with notice to (but not consent of) Key Employee. The Introductory Terms and the Definitions set forth at the beginning of this Agreement are incorporated herein by reference and are contractual in nature.

E. The employment of Key Employee by the Company is "at will" and either the Company or Key Employee may terminate the employment at any time, with or without cause, or for convenience, at any time. Nothing in this Incentive Plan shall affect the status of the Key Employee as being employed "at will" or entitle Key Employee to employment or continued employment for any period of time with the Company. Notice to Key Employee may be made by in any manner permitted by the Employment Agreement of Key Employee with the Company.

F. The Company shall be entitled to recover any payment made and/or offset any payment due to Key Employee under this Incentive Plan in the event of any breach of the Employment Agreement of Employee with the Company (or its successor in the event of a Transaction), or with regard to any debt, obligation or liability owed by Key Employee to the Company or its affiliates at any time, or by virtue of any damage or loss resulting to Company as a result of the breach by Key Employee of his Employment Agreement, or any terms thereof, in addition to all other rights and remedies of the Company, all of which are reserved.

G. In the event the Company determines that the Company's financial results for any time frame that is involved in determining the amount of any payment to Key Employee under this Incentive Plan are not accurate and the payment(s), as applicable, to Key Employee under this Incentive Plan amount would have been lower had the financial results been properly calculated, such overpaid amount shall be reimbursed to the Company and shall be a debt and obligation of Key Employee to the Company. The Company shall have the authority and right to (i) obtain reimbursement from the Key Employee of any such overpayment and (ii) in addition, to further offset and adjust any other payments to be paid to Key Employee under this Incentive Plan or under the Employment Agreement of Key Employee. All rights and remedies of the Company are reserved.

H. This Incentive Plan is intended to bind and inure to the benefit of and be enforceable by Employee, the Company and their respective heirs, personal representatives, successors and assigns, except that Employee may not assign his rights or delegate his duties or obligations hereunder or under his Employment Agreement with the Company. The Company may assign this Incentive Plan with the assumption of it by the assignee and in this event, the Company shall be released from all obligations under the Incentive Plan completely. This Incentive Plan is not for the benefit of any third party.

I. The Company may with notice to Key Employee (but not consent) prospectively terminate this Incentive Plan in the event of the liquidation, dissolution, insolvency or cessation of business of the Company.

J. Notwithstanding any other provision of this Incentive Plan, any payments due under this Incentive Plan will be delayed if making or accruing the payment would jeopardize the ability of the Company to continue as a going concern, or threaten its financial viability, or result in or cause a default in connection with any loan to or for the Company, or if the Company is insolvent, all as determined by the Company (any or all of the above the "Company Financial Concerns"). If a payment is so delayed, the payment will be made during the first calendar year in which the Company determines the making of the payment would not involve the Company Financial Concerns. No interest shall accrue on any such delayed payment.

K. To the maximum extent permitted by law, neither the Company, nor any of its management or officers, shall be liable for any action, failure to act, or determination of interpretation made in good faith with respect to the Incentive Plan. Any claim, action or proceeding by Key Employee against the Company arising under or relating to this Incentive Plan must be commenced within the shorter of (i) the shortest limit of time permitted by the laws of the State of Tennessee, or (ii) no later than twenty-four (24) months after the alleged breach or other event giving rise to Key Employee's claim occurs, without regard to the date of discovery. Any such claim, action or proceeding not brought within such time period shall be barred.

L. In the event that any provision of the Incentive Plan shall be considered illegal or invalid for any reason, such illegality or invalidity shall not affect the remaining provisions of the Incentive Plan, but shall be fully severable, and the Incentive Plan shall be construed and enforced as if such illegal or invalid provision had never been contained therein. Provided, notwithstanding any provision of this Incentive Plan, in the event that the Incentive Plan shall be determined to be subject to ERISA, or in the event that Key Employee should ever assert or seek to assert in any manner that the Incentive Plan is or was subject to ERISA, then to the fullest extent permitted by applicable law, (i) this Incentive Plan shall be null and void and (ii) Key Employee agrees to indemnify and hold harmless the Company from all judgments, loss, cost, fines, interest or expense (including without limitation settlement amounts and attorney fees and costs), asserted against or incurred by the Company arising therefrom.

M. The Employee acknowledges that he has had the opportunity to consult with the attorney of his choice in connection with his Employment Agreement with the Company and this Incentive Plan.

N. This Incentive Plan and the rights of the parties hereunder will be governed by, interpreted, and enforced in accordance with the laws of the State of Tennessee. The parties will first attempt to promptly resolve any dispute or controversy arising out of or relating to this Incentive Plan (any a "dispute"). Any such negotiations are confidential and will be treated as compromise and settlement negotiations for all purposes. The parties hereby irrevocably consent and agree to the exclusive jurisdiction and venue of any federal or state court sitting in a judicial district located in Davidson County, State of Tennessee, for the litigation of all disputes arising under or relating to this Incentive Plan. Key Employee and Company shall each bear their own attorney fees, court costs and expert witness costs in any such litigation, and further waive all rights to seek attorney fees and costs under all statutory authority, to the fullest extent permitted by law, excepting any indemnity obligation of Key Employee to the Company. **TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN ANY LITIGATION THE PARTIES AGREE NOT TO ELECT AND HEREBY FURTHER WAIVE ALL RIGHTS TO A TRIAL BY JURY OF ANY DISPUTE OR ISSUE THEREIN TRIABLE OF RIGHT BY JURY AND WAIVE ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.**

**Agreed and Approved:**

A&D Supply of Nashville, LLC

By: ______________________ 3-6-20
George W. Hughes, III, Manager

______________________ 2-28-2020
Bob Bowser, Key Employee





Exhibit 2

DocuSign Envelope ID: 1A0380B8-9290-4CDB-A1AC-16FD046531D9



E-FILED
11/21/2024 3:50 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of October 2, 2023 between Foundation Building Materials, LLC, a California limited liability company (the "Company") and Robert C. Bowser, an individual (the "Employee") (each of the foregoing individually a "Party" and collectively the "Parties").

## RECITALS

WHEREAS, the Company, on the one hand, and A&D Supply of Nashville, LLC, an Oklahoma Limited Liability Company, (the "Seller"), on the other hand, are parties to an Asset Purchase Agreement, dated of even date herewith (the "Purchase Agreement"), among others named as "Seller Parties";

WHEREAS, solely upon the occurrence of the Closing (as defined in the Purchase Agreement), the Company wishes to employ the Employee and the Employee wishes to be employed by the Company, in each case, on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1. Employment. The Employee's employment hereunder shall commence on the Closing Date (as defined in the Purchase Agreement) or such other date as may be mutually agreed between the Parties (the "Effective Date") and end on the date that the Employee's employment is terminated pursuant to Section 3 hereof (the "Employment Period"). In the event that the Purchase Agreement is terminated in accordance with its terms prior to the Closing of the transactions contemplated thereby, this Agreement shall be null and void and without effect. During the Employment Period, the Employee shall serve as the Nashville Sales Manager, reporting to Regional Vice President of the Southeast, Sales of the Company ("General Manager"). In such position, the Employee shall have such duties, authority, and responsibility as shall be determined from time to time by the General Manager, which duties, authority, and responsibility shall be consistent with the Employee's position. During the Employment Period, the Employee will devote his full business time and use his best efforts to advance the business and welfare of the Company and its subsidiaries and other affiliates and will not engage in (i) any other employment or business activities, or (ii) any other activities for any direct or indirect remuneration that could reasonably be expected to be harmful or detrimental to the business and affairs of the Company or that could reasonably be expected to materially interfere with his duties hereunder. The foregoing, however, shall not preclude the Employee from (i) serving on civic or charitable boards or committees, managing personal or family investments, or engaging in such other activities as the Board of Directors of the Company or its equivalent (such entity, the "Board") may approve in writing from time to time, or (ii) passively investing in other businesses; *provided* that such investment does not exceed two percent (2%) of publicly traded securities of any corporation or




Media Access Portal

DocuSign Envelope ID: 1A0380B8-9290-4CDB-A1AC-16FD046531D9

that Employee is not a controlling person of, or a member of a group that controls, such corporation; *provided, further,* that such activities in (i) and (ii) do not materially interfere with the performance of the Employee's responsibilities hereunder.

2. Compensation.

(a) Base Salary. The Employee shall receive a base salary at a rate of $171,600 through 2023, which shall be paid in accordance with the customary payroll practices of the Company. Beginning January 1, 2024, Employee shall receive a base salary at a rate of $145,330 which shall be paid in accordance with the customary payroll practices of the Company and shall be subject to review on an annual basis as determined by the Board or a committee thereof (the "Base Salary"). The Employee's Base Salary shall not be subject to decrease, other than a reduction which is part of a general cost reduction approved by the Board affecting other similarly situated employees and which does not exceed ten percent (10%) of the Employee's then Base Salary when combined with any such prior reductions.

(b) Annual Bonus. With respect to each calendar year ending during the Employment Period, in addition to the Base Salary, the Employee shall have the opportunity to earn an annual cash performance bonus (the "Annual Bonus") based upon the achievement of performance targets established by the Board (or a committee thereof) in accordance with the terms of the annual cash performance bonus plan in effect with respect to such calendar year, if the Board (or a committee thereof) determines, in its sole and absolute discretion, to adopt such a plan in such calendar year. Each Annual Bonus (and the target amount of such Annual Bonus) shall be determined in accordance with such plan, if any, in effect for such calendar year. For the period beginning on the Effective Date and ending on the last day of the applicable calendar year, the Employee shall be eligible to receive a prorated Annual Bonus (calculated as the Annual Bonus that would have been paid for the entire calendar year multiplied by a fraction the numerator of which is equal to the number of days the Employee worked in the applicable calendar year and the denominator of which is equal to the total number of days in such year). Except as otherwise provided in Section 3, in order to receive payment of any Annual Bonus for a particular calendar year, the Employee must be continuously employed by the Company through the date of actual payment. Each Annual Bonus, if any, will be paid within two and a half (2½) months after the end of the applicable calendar year to which such Annual Bonus relates.

(c) Participation in Benefit Plans. During the Employment Period, the Employee shall be entitled to receive all perquisites and participate in all of the benefit plans, programs and policies maintained by the Company from time to time that are available generally to its similarly situated employees; *provided, however,* that the Employee's right to receive such perquisites and participate in such plans, programs and policies shall not affect the Company's right to amend or terminate the general applicability of such perquisites, plans, programs and policies. The Company may, in its sole discretion and from time to time, amend, eliminate, or establish benefit programs as it deems appropriate.

(d) Expenses. The Company shall reimburse the Employee for all reasonable travel and other business expenses incurred by him in the performance of his duties to the Company in accordance with the Company's applicable expense reimbursement policies and procedures in



Media Access Portal

effect from time to time. Any expenses shall be reimbursed promptly in accordance with such policies and procedures.

(e) Paid Time Off. The Employee shall be entitled to such periods of paid time off ("PTO") each year as provided from time to time under the Company's PTO policy and as otherwise provided for similarly situated employees.

(f) Claw back. Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based or other compensation paid to the Employee under this Agreement or any other agreement or arrangement with the Company which is subject to recovery under any law, government regulation, stock exchange listing requirement or policy established by the Company will be subject to such deductions and claw back as may be required to be made pursuant to such law, government regulation, stock exchange listing requirement, or policy established by the Company providing for claw back or recovery of amounts that were paid to the Employee (whether in existence as of the Effective Date or later adopted).

3. Termination of Employment. Subject to the further provisions of this Section 3, the Employment Period and the Employee's employment hereunder may be terminated by either Party at any time and for any or no reason; *provided, however,* that the Company and the Employee will be required to give written notice of any termination of the Employee's employment as set forth in this Section 3. Notwithstanding any other provision of this Agreement, the provisions of this Section 3 shall exclusively govern the Employee's rights to compensation and benefits upon termination of employment with the Company.

(a) Notice of Termination. Any termination or resignation of the Employee's employment by the Company or by the Employee, as applicable, under this Section 3 (other than termination of employment as a result of the Employee's death) shall be communicated by a written notice (a "Notice of Termination") to the other Party hereto (i) to the extent applicable, indicating whether the termination is for or without Cause (as defined below), or the facts, circumstances or reasoning behind the resignation, (ii) indicating the specific termination provision in this Agreement relied upon, and (iii) specifying a date of termination (the "Date of Termination"), which, if submitted by the Employee, shall be thirty (30) days following the date of such notice (which date may be earlier as determined by the Company, without changing the characterization of such termination), if submitted by the Company for Cause, the first business day following the last day of the Employee's Cure Period if applicable (as defined below), or such other date as is mutually agreed by the Company and the Employee.

(b) Accrued Rights. Upon a termination of the Employee's employment for any reason, the Employee (or the Employee's estate) shall be entitled to receive the sum of the Employee's Base Salary through the Date of Termination not theretofore paid (payable as soon as practicable following, but in all events within 30 days of the Date of Termination); any unreimbursed business expenses incurred in accordance with the Company's policies in effect from time to time; and any amount arising from the Employee's participation in, or benefits under, any employee benefit plans, programs or arrangements (including without limitation, any disability or life insurance benefit plans, programs or arrangements), which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements (collectively, the "Accrued Rights").





Media Access Portal

(c) Termination by the Company; Resignation.

(i) If the Employee's employment is terminated (i) by the Company with or without Cause at any time or (ii) upon the Employee's resignation, the Employee shall only be entitled to receive the Accrued Rights. Following the Employee's termination of employment by the Company at any time, or upon the Employee's resignation, except as set forth in this Section 3(d), the Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(ii) "Cause" shall be deemed to exist if any one or more of the following items shall apply: (A) a material breach of any written agreement between the Employee and the Company or any affiliate, including, without limitation, a material breach by the Employee of the Employee's obligations under this Agreement or any other written agreement between the Employee and the Company or an affiliate; (B) non-performance by the Employee of his duties and responsibilities to the Company (other than any such non-performance resulting from the Employee's incapacity due to physical or mental illness or any such non-performance after his issuance of a written notice to the Company of his intention to resign), (C) intentional or negligent misconduct or engagement in dishonesty by the Employee, which is, in each case, injurious to the Company or any affiliate, (D) a material violation by the Employee of any written policies of the Company, including written policies related to discrimination, harassment, performance or illegal or unethical activities and ethical misconduct, or the valid and lawful directions of the Board, General Manager or the Employee's direct supervisor; (E) a breach of any fiduciary duty which the Employee owes to the Company or any affiliate in his capacity as an employee or officer; (F) embezzlement, misappropriation, or fraud by the Employee, whether or not related to the Employee's employment with the Company; (G) the indictment for, conviction or plea of guilty or no contest by the Employee with respect to (a) a felony or (b) embezzlement, dishonesty, a crime involving moral turpitude, or intentional and actual fraud; (H) the use of illicit drugs or other illicit substances or the abuse of licit drugs or other substances on Company premises or during the performance of the Employee's duties or that otherwise causes material harm to the Company or any affiliate; (I) an unexplained or unexcused absence from work for more than ten (10) days in any twelve (12) month period (vacation, Company-approved personal leave, Company-approved sick leave, and Disability excepted); or (J) engagement in conduct that brings or is reasonably likely to bring the Company negative publicity or into public disgrace, embarrassment, or disrepute. The Employee's employment will be deemed to have been terminated for Cause if it is determined subsequent to his termination of employment (for any other reason) that grounds for termination of his employment for Cause existed at the time of his termination of employment. In each such case of Cause, the Company shall provide the Employee with written notice specifying in reasonable detail the grounds for a Cause termination and with respect to subsections (A), (B) and (D), the Employee shall have a period of thirty (30) days to cure, if curable as determined by the Company, after receipt of the written notice (the "Employee's Cure Period").

(d) Disability or Death. The Employment Period and the Employee's employment hereunder shall terminate immediately upon the Employee's death and may be terminated by the Company if the Employee becomes or is reasonably expected to be (in the good





Media Access Portal

faith judgment of the Board or the General Manager) physically or mentally incapacitated and therefore unable for a period of one hundred twenty (120) consecutive days to perform the essential functions of the Employee's position, for or without a reasonable accommodation (such incapacity is hereinafter referred to as "Disability"), in each case, in a manner consistent with applicable state and federal law. Upon termination of the Employee's employment hereunder by reason of his Disability or death, the Employee or the Employee's estate (as the case may be) shall only be entitled to receive (i) the Accrued Rights and (ii) such additional payments, if any, as determined by the Board in its sole and absolute discretion. Following the termination of the Employee's employment by reason of the Employee's Disability or death, except as set forth in this Section 3(e), the Employee shall have no further rights to any compensation or any other benefits under this Agreement, *provided, further*, that in the event the Company temporarily replaces the Employee, or transfers the Employee's duties or responsibility to another individual on account of the Employee's inability to perform such duties due to a physical or mental incapacity which is, or is reasonably expected to become, a Disability, then the Employee's employment shall not be deemed terminated by the Company.

(e) Acknowledgement. Employee acknowledges and agrees that, other than the payments described in Section 3(b), 3(c) and 3(d), upon the Date of Termination, Employee shall not be entitled to any other severance or severance payments of any kind under any employee benefit plan or severance policy generally available to the Company's employees or otherwise and, except as otherwise specified herein, all other rights of Employee to compensation under this Agreement shall end as of the Date of Termination.

(f) Return of Property. Upon cessation of the Employee's employment with the Company for any reason, whether voluntary or involuntary, the Employee shall immediately deliver to the Company (i) all physical, computerized, electronic or other types of records, documents, proposals, notes, lists, files and any and all other materials, including computerized and electronic information, that refers, relates or otherwise pertains to the Company or any affiliate of the Company (or business dealings thereof) that are in the Employee's possession, subject to the Employee's control or held by the Employee for others; and (ii) all property or equipment that the Employee has been issued by the Company or any affiliate of the Company during the course of his employment or property or equipment thereof that the Employee otherwise possesses, including any computers, cellular phones, pagers and other devices, and any logins or passwords for any such devices. The Employee acknowledges that the Employee is not authorized to retain any physical, computerized, electronic, or other types of copies of any such physical, computerized, electronic or other types of records, documents, proposals, notes, lists, files or materials, and is not authorized to retain any other property or equipment of the Company or any affiliate of the Company. The Employee further agrees that the Employee will promptly forward to the Company (and thereafter destroy any physical or electronic copies thereof) any Confidential Information (as defined below) relating to the Company or any affiliate of the Company that has been or is inadvertently directed to the Employee following the Employee's last day of employment. The provisions of this Section 3(f) are in addition to any other written obligations on the subjects covered herein that the Employee may have with the Company and its affiliates, and are not meant to and do not excuse such obligations. Upon the termination of his employment with the Company or its subsidiaries, the Employee shall, upon the Company's request, promptly execute and deliver to the Company a certificate (in form and substance satisfactory to the Company) to the effect that the Employee has complied with the provisions of this Section 3(f).






Media Access Portal

(g) Resignation of Offices. Promptly following any termination of the Employee's employment with the Company, the Employee shall be deemed to have resigned from all positions that the Employee may then hold as an employee, officer, director or manager of the Company or any affiliate of the Company. The Employee or the Employee's legal representative shall promptly deliver to the Company any additional documents reasonably required by the Company to confirm such resignations.

(h) Further Assurances; Cooperation. Following the termination of the Employee's employment with the Company, the Employee shall execute any and all documents to secure the Company's right to any Work Product (as defined in Section 4(b)), and the Employee agrees to make himself available as reasonably practical with respect to, and to use reasonable efforts to cooperate in conjunction with, any litigation or investigation arising from events that occurred during the Employee's employment with the Company and its affiliates (whether such litigation or investigation is then pending or subsequently initiated) involving the Company or any affiliate of the Company, including providing testimony and preparing to provide testimony if so requested by the Company. The Company shall reimburse the Employee for any reasonable out of pocket expenses incurred by the Employee in complying with this Section 3(h), provided that such expenses are approved by the Company in advance.

4. Restrictive Covenants. The Employee acknowledges that the Company has spent significant time, effort and resources protecting its Confidential Information and customer goodwill. The Employee further acknowledges that the Confidential Information is of significant competitive value to the Company in the industry in which it competes, and that the use or disclosure, even if inadvertent, of such Confidential Information for the benefit of a competitor would cause significant damage to the legitimate business interests of the Company.

(a) Confidential Information. During Employee's employment with the Company, the Employee will be given access to and receive Confidential Information regarding the business of the Company and its affiliates. The Employee agrees that the Confidential Information constitutes protectable business interests of the Company and its affiliates and covenants and agrees that at all times during the Employee's employment with the Company, and at all times following the Employee's termination, the Employee will not, directly or indirectly, disclose any Confidential Information. As used in this Agreement, the term "Confidential Information" means any and all confidential, proprietary or trade secret information of the Company or an affiliate not within the public domain, whether disclosed, directly or indirectly, verbally, in writing (including electronically) or by any other means in tangible or intangible form, including that which is conceived or developed by the Employee, applicable to or in any way related to: (i) the present or future business activities, products and services, and customers and suppliers of the Company or its affiliates; (ii) the research and development of the Company or its affiliates; or (iii) the business of any customer or vendor of the Company or its affiliates. Such Confidential Information includes the following property or information of the Company or its affiliates, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, customer lists, supplier lists, designs, drawings, algorithms, source code, object code, know-how, improvements, inventions, licenses, techniques, all plans or strategies for marketing, development and pricing, business plans, financial statements, profit margins and all information concerning existing or potential clients, suppliers or vendors. Confidential Information of the Company also means all similar information disclosed to any member of the





Media Access Portal

Company by third parties that is subject to confidentiality obligations. The Company shall not be required to advise the Employee specifically of the confidential nature of any such information, nor shall the Company be required to affix a designation of confidentiality to any tangible item, in order to establish and maintain its confidential nature. Notwithstanding the preceding to the contrary, Confidential Information shall not include general industry information or information that is publicly available or readily discernable from publicly available products or literature; information that the Employee lawfully acquires from a source other than the Company or its affiliates or any client or vendor of the Company or any of its affiliates (provided that such source is not bound by a confidentiality agreement with the Company or any of its affiliates); information that is required to be disclosed pursuant to any law, regulation, rule of any governmental body or authority, or stock exchange, or court order; or information that reflects Employee's own skills, knowledge, know-how and experience gained prior to employment or service and outside of any connection to or relationship with the Company or any of its affiliates, or the predecessors of any such entities; and information that was known by the Employee prior to his employment with the Company. Notwithstanding the foregoing, Employee will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, if Employee files a lawsuit for retaliation by Company for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's attorney and use the trade secret information in the court proceeding if Employee files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order.

(b) Intellectual Property Ownership. The Employee hereby assigns to the Company all rights, including, without limitation, copyrights, patents, trade secret rights, and other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes, works of authorship, Confidential Information or trade secrets (i) developed or created by the Employee, solely or jointly with others, during the course of performing work for or on behalf of the Company or any affiliate of the Company, or the predecessors of any such entities, whether as an employee or independent contractor, (ii) that the Employee conceives, develops, discovers or makes in whole or in part during the Employee's employment by the Company that relate to the business of the Company or any affiliate of the Company or the actual or demonstrably anticipated research or development of the Company or any affiliate of the Company, (iii) that the Employee conceives, develops, discovers or makes in whole or in part during or after the Employee's employment by the Company that are made through the use of any of the equipment, facilities, supplies, trade secrets or time of the Company or any affiliate of the Company, or that result from any work the Employee performs for the Company or any affiliate of the Company, or (iv) developed or created by the Employee, solely or jointly with others, at any time before the Employment Period, that relate to or involve the Company's businesses (including, but not limited to, the business of the Company or any of its affiliates) (collectively, the "Work Product"). This Agreement does not include assignment of any of the Employee's rights to any invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on the Employee's own time, unless (a) the invention relates (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Employee for the






Media Access Portal

Company. Without limiting the foregoing assignment, to the extent possible, all software, compilations and other original works of authorship included in the Work Product will be considered a "work made for hire" as that term is defined in Title 17 of the United States Code. If, notwithstanding the foregoing, the Employee for any reason retains any right, title or interest in or relating to any Work Product, the Employee agrees promptly to assign, in writing and without any requirement of further consideration, all such right, title, and interest to the Company. Upon request of the Company at any time during or after the Employment Period, the Employee will take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to evidence, perfect, record or otherwise give full and proper effect to any assignments of rights under or pursuant to this Agreement. The Employee will promptly disclose to the Company any such Work Product in writing.

(c) Agreement Not to Solicit Employees. The Employee agrees that during the period commencing on the Effective Date and ending on the date that is two (2) years after the Date of Termination, whether voluntary or involuntary (the "Restricted Period"), the Employee shall not, directly or indirectly, on behalf of himself or any other person or entity (A) cause, induce, or attempt to cause or induce any employee, agent, or independent contractor of the Company (who had that status prior to the Date of Termination) to terminate such relationship; (B) in any way interfere with the relationship between the Company and any of its employees, agents, or independent contractors; or (C) hire, retain, employ, or otherwise engage or attempt to hire, retain, employ, or otherwise engage as an employee or otherwise, any employee of the Company prior to the Date of Termination.

(d) Agreement Not to Solicit Customers. The Employee agrees that during the Restricted Period, the Employee shall not, directly or indirectly, on behalf of himself or any other person or entity (A) solicit, induce, or otherwise cause, or attempt to solicit, induce, or otherwise cause, any customer, supplier, licensor, licensee, or any prospective customer, supplier, licensor, or licensee that has been contacted or targeted for contact by the Company at any time prior to the Date of Termination, or any other person engaged in a business relationship with the Company at any time prior to the Date of Termination, to (1) terminate, curtail, or otherwise modify its relationship with the Company or the Company's affiliates or (2) engage in business with a competitor of the Company or the Company's affiliates, or (B) interfere in any way with the relationship between the Company and its affiliates, on the one hand, and any of their respective current or prospective customers, suppliers, licensors, licensees, or any other person engaged in a business relationship with the Company or its affiliates, except as directed by and for the benefit of the Company or its affiliates.

(e) Agreement Not to Compete. In order to protect the legitimate business and customer goodwill interests of the Company, to protect that Confidential Information against inappropriate use or disclosure, and in consideration for the Employee's employment and the benefits provided to the Employee (including, without limitation, the benefits payable to the Employee pursuant to this Agreement), the Employee hereby agrees that during the Restricted Period, whether voluntary or involuntary, the Employee shall not directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, manager, employee, partner, equity holder, member, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any Competitive Business anywhere within 50 miles of the branch(es) of the Company that Employee oversees or engages in a would be Competitive



Media Access Portal

Business; *provided*, that nothing herein shall prohibit the Employee from being, directly or indirectly, a passive owner of not more than 2% of the outstanding stock of any class of a corporation which is publicly traded so long as the Employee does not have any active participation in the business of such corporation. "Competitive Business" means any business enterprise, other than the Company and its affiliates, that is engaged in (a) the business of supplying and distributing building materials, including, without limitation, drywall, insulation (including glass fiber, fiberglass blowing wool and fiberglass batts, mineral wool, and cellulose used in interiors applications in residential and commercial construction), ceiling tiles and grid, metal track and studs, exterior insulation finish systems, doors, frames and hardware, lumber, fasteners and adhesives, tools, and other related products, and providing related services, (b) any other business conducted by the Company or the Company's affiliates as of the Date of Termination, as such business may be extended or expanded as contemplated by the strategic plan of the Company or any of its affiliates as of the Date of Termination, including, without limitation, entities such as GMS, US LBM, Rosen, Feldman Lumber, ABC Supply-L&W Supply, Kamco, Rew, INEX, Service Partners, Insulation Distributors Inc (IDI), Installed Building Products (IBP), or independent ventures that operate wholly or partially in that business; provided however, Employee may become an employee of a roofing, concrete or paving business so long as 1) such business is not a Competitive Business; 2) such employment does not begin within six (6) months of the Effective Date of this Agreement; and 3) Employee continues to comply with all confidentiality, non-solicit of Employee, and non-solicit of Customer obligations, specifically including those in 4(a)-(d). This Section 4(e) does not affect any other non-competition agreements entered into by the Employee with the Company.

(f) Non-Disparagement. Employee agrees not to directly or indirectly make any statements (whether such statement legally constitutes libel or slander), or cause or encourage others to make any statements, that defame, disparage or in any way criticize or otherwise reflect negatively on the personal or business reputations, practices or conduct of Company or any affiliate or each of its and their officers, directors, employees, agents, advisors, partners, affiliates, workers or consultants, or clients through any means, including, but not limited to, through the use of verbal, written, digital or electronic communications, including any and all social media platforms. Employee further agrees that Employee shall not directly or indirectly say or publish anything that shall, or may, bring Company's or any affiliate's officers, directors, employees, agents, advisors, partners, affiliates, workers or consultants into disrepute. Notwithstanding the foregoing, nothing in this Section shall prevent Employee from disclosing information regarding any unlawful conduct and/or discrimination to law enforcement, the Equal Employment Opportunity Commission, any local commission on human rights, and/or an attorney retained by the Employee.

(g) Enforcement. The Employee acknowledges having carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed upon the Employee pursuant to this Section 4. The Employee agrees that each of the restraints contained herein are necessary for the protection of the goodwill, Confidential Information and other legitimate interests of the Company; that each and every one of these restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints, individually or in the aggregate, will not prevent the Employee from obtaining other suitable employment during the period in which the Employee is bound by such restraints. The Employee further acknowledges that, were the Employee to breach any of the covenants contained in this Section 4, the damage to the Company would be irreparable. The Employee further acknowledges that





Media Access Portal

Company may suffer irreparable harm due to delay if, as a condition to obtaining an injunction, restraining order, temporary or provisional remedy or other equitable remedy with respect to the breach, the Company were required to demonstrate that it would suffer irreparable harm. The Employee therefore intends that if the Employee breaches one or more of the Employee's obligations under this Agreement, then for purposes of determining whether to grant an equitable remedy any court will presume that the breach would cause irreparable harm. The Employee therefore agrees that the Company, in addition to any other remedies available to it, shall be entitled to injunctive relief against any breach or threatened breach by the Employee of any of said covenants without any obligations to post a bond or other security.

(h) Modification. If at the time of enforcement of this Agreement, a court of competent jurisdiction holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by applicable laws.

5. Severability. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event of a conflict between the application to any particular facts or circumstances of Section 4(h) and this Section 5, Section 4(h) shall control and be given effect to the maximum extent permitted by applicable law prior to the application of this Section 5 to such facts and circumstances.

6. Mutual Drafting. Each Party has had the opportunity to be represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, at arm's length, with the advice and participation counsel, and shall be interpreted in accordance with its terms without favor to either Party, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of the authorship of any of the provisions of this Agreement.

7. Section 409A of the Internal Revenue Code.

(a) Notwithstanding anything contained in this Agreement to the contrary, to the maximum extent permitted by applicable law, amounts payable to the Employee pursuant to Section 3 are intended to be made in reliance upon Treas. Reg. § 1.409A-1(b)(4) (short-term deferral) or Treas. Reg. § 1.409A-1(b)(9) (involuntary separation pay) or any other applicable exemption under Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"). No amounts payable under this Agreement upon the Employee's termination of employment shall be payable unless the Employee's termination of employment constitutes a "separation from service" within the meaning of Treas. Reg. § 1.409A- 1(h) (a "Separation from Service"). The Company and the Employee intend that their exercise of authority or discretion under this Agreement shall be consistent with the foregoing exemptions under, or comply with,



Media Access Portal

Section 409A. If any provision of this Agreement does not satisfy the requirements of Section 409A, such provision shall nevertheless be applied in a manner consistent with those requirements.

(b) If the Employee is a "specified employee" (as defined in Section 409A), as determined by the Company in accordance with Section 409A, on the date of the Employee's Separation from Service, to the extent that the payments or benefits under this Agreement are subject to Section 409A and the delayed payment or distribution of all or any portion of such amounts to which the Employee is entitled under this Agreement is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i), then such portion deferred pursuant to this Section 7(b) shall be paid or distributed to the Employee in a lump sum on the earlier of (i) the date that is six (6)-months following the Employee's Separation from Service, (ii) the date of the Employee's death or (iii) the earliest date as is permitted under Section 409A. Any remaining payments due under the Agreement shall be paid as otherwise provided herein.

(c) All reimbursements for costs and expenses under this Agreement shall be paid in no event later than the end of the calendar year following the calendar year in which the Employee incurs such expense. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (ii) the amount of expenses eligible for reimbursements or in-kind, benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year.

(d) If any provision of this Agreement would subject the Employee to additional tax or interest under Section 409A, the Company and the Employee shall amend this Agreement, or take such other actions as the Employee and the Company deem reasonably necessary or appropriate, to comply with the requirements of Section 409A and the Treasury Regulations thereunder (and any applicable transition relief) while preserving the economic agreement of the Parties. In no event whatsoever shall the Company be liable for any tax, interest or penalties that may be imposed on the Employee under Section 409A. Notwithstanding the foregoing, no particular tax result for the Employee with respect to any income recognized by the Employee in connection with this Agreement is guaranteed. Neither the Company nor any of its affiliates shall have any obligation to indemnify or otherwise hold the Employee harmless from any or all such taxes, interest, or penalties, or liability for any damages related thereto. The Employee acknowledges that the Employee has been advised to obtain independent legal, tax or other counsel in connection with Section 409A. Each payment under this Agreement is intended to be a "separate payment" and not a series of payments for purposes of Section 409A. Any payments or reimbursements of any expenses provided for under this Agreement shall be made in accordance with Treas. Reg. § 1.409A-3(i)(1)(iv). All references in this Agreement to Section 409A include rules, regulations, and guidance of general application issued by the Department of the Treasury under Section 409A.

8. Governing Law. This Agreement shall be construed and enforced under and be governed in all respects by the laws of the State of Tennessee, without regard to the conflict of laws principles thereof.

Media Access Portal

9. Binding Arbitration.

(a) Generally. The Employee and the Company agree that any controversy or claim arising out of or relating to this Agreement, the employment relationship between the Employee and the Company, or the termination thereof, including the arbitrability of any controversy or claim, which cannot be settled by mutual agreement will be finally settled by binding arbitration in accordance with the Expedited Arbitration Procedures of Judicial Arbitration & Mediation Service, Inc. ("JAMS"), as set forth in Section 16.1 et seq. of the JAMS rules, or any successor provision thereto, as follows: any Party aggrieved will deliver a notice to the other Party setting forth the specific points in dispute. Any points remaining in dispute twenty (20) days after the giving of such notice may, upon ten (10) days' notice to the other Party, be submitted to JAMS arbitration conducted before a single neutral arbitrator in Orange County, California. The arbitrator shall be appointed by agreement of the Parties hereto or, if no agreement can be reached, by JAMS. The arbitrator may enter a default decision against any Party who fails to participate in the arbitration proceedings. Notwithstanding the foregoing, a Party who seeks equitable relief, including injunctive relief, shall not be obligated to utilize the arbitration proceedings required hereunder and instead may seek such relief in any state or federal court of competent jurisdiction.

(b) Binding Effect. The decision of the arbitrator on the points in dispute will be final, unappealable and binding, and judgment on the award may be entered in any court having jurisdiction thereof. The arbitrator shall only be authorized to interpret the provisions of this Agreement, and shall not amend, change, or add to any such provisions. The Parties agree that this provision has been adopted by the Parties to resolve any disputes rapidly and inexpensively between them and that this provision will be grounds for dismissal of any court action commenced by either Party with respect to this Agreement, other than post-arbitration actions seeking to enforce an arbitration award or proceedings seeking equitable relief as permitted under Section 9(a). If any court determines that this arbitration procedure is not binding, or otherwise allows any litigation regarding a dispute, claim, or controversy covered by this Agreement to proceed, the Parties hereto hereby waive any and all right to a trial by jury in or with respect to such litigation.

(c) Fees and Expenses. Except as otherwise provided in this Agreement or by applicable law, the arbitrator will be authorized to apportion its fees and expenses as the arbitrator deems appropriate and the arbitrator will be authorized to award the prevailing Party its fees and expenses (including reasonable attorneys' fees). In the absence of any such apportionment or award, each Party will bear its own expenses and the fees of its own attorney.

(d) Confidentiality. The Parties and the arbitrator will keep confidential, and will not disclose to any person, except the Parties' advisors and legal representatives, or as may be required by law, the existence of any controversy under this Section 9, the referral of any such controversy to arbitration or the status or resolution thereof.

(e) Waiver. The Employee acknowledges that arbitration pursuant to this Agreement includes all controversies or claims of any kind (e.g., whether in contract or in tort, statutory or common law, legal or equitable) now existing or hereafter arising under any federal, state, local or foreign law, including, but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Employee Retirement Income Security Act, the Family and Medical Leave Act, the Americans With






Media Access Portal

Disabilities Act and all similar federal, state and local laws, and the Employee hereby waives all rights thereunder to have a judicial tribunal and/or a jury determine such claims.

(f) Acknowledgment. The Employee acknowledges that before agreeing to participate in this Agreement, the Employee has had the opportunity to consult with any attorney or other advisor of the Employee's choice, and that this provision constitutes advice from the Company to do so if the Employee chooses. The Employee further acknowledges that the Employee has agreed to enter into this Agreement of the Employee's own free will, and that no promises or representations have been made to the Employee by any person to induce the Employee to enter into this Agreement other than the express terms set forth herein. The Employee further acknowledges that the Employee has read this Agreement and understands all of its terms, including the waiver of rights set forth in this Section 9.

10. Notification to Subsequent Employer. When the Employee's employment with the Company terminates, the Employee agrees to notify any subsequent employer of the restrictive covenants contained in this Agreement. The Employee will also deliver a copy of such notice to the Company before the Employee commences employment with any subsequent employer. In addition, the Employee authorizes the Company to provide a copy of the restrictive covenant sections of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employer.

11. Representations of the Employee. The Employee represents and warrants to the Company that: (a) the Employee's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound; and (b) the Employee's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

12. Assignment. Neither the Company nor the Employee may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; *provided, however,* that the Company may assign its rights and obligations to any affiliate or a successor to the business of the Company or all or substantially all of the assets of the Company without the consent of the Employee. This Agreement shall inure to the benefit of and be binding upon the Company and the Employee, their respective successors, executors, administrators, heirs and permitted assigns.

13. Waiver. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving Party. The failure of either Party to require the performance of any term or obligation of this Agreement, or the waiver by either Party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

14. Attorneys' Fees. Should any litigation or other proceeding be commenced between the Parties concerning this Agreement (including, without limitation, the enforcement hereof and the rights and duties of the Parties hereunder), then the prevailing party in such litigation, arbitration or other proceeding shall be entitled, in addition to such other relief as may be granted,






Media Access Portal

to its reasonable attorneys' fees and expenses in connection with such litigation, arbitration or other proceeding, but in all other circumstances each party shall bear its own attorneys' fees and expenses.

15. Notices. Any and all notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered in person, consigned to a reputable national courier service or deposited in the United States mail, postage prepaid, registered or certified, and addressed to the Employee at his last known address on the books of the Company or, in the case of the Company, at its principal place of business, attention of the Legal Department or to such other address as any Party may specify by notice to the other actually received.

16. Entire Agreement. This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties with respect to such subject matter, including, without limitation, any previous employment agreements entered into between Employee and the Company or any of its affiliates. Further, the Employee agrees that, upon the Effective Date of this Agreement, any prior employment agreement or arrangement between Employee, on the one hand, and the Seller Parties and any of its affiliates, on the other hand, shall be terminated and of no further force nor effect.

17. Amendment. This Agreement may be amended or modified only by a written instrument signed by the Employee and by an expressly authorized representative of the Company.

18. Headings. The headings and captions in this Agreement are for convenience only, and in no way define or describe the scope or content of any provision of this Agreement.

19. Tolling. If the Employee violates any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which the Employee ceases to be in violation of such obligation.

20. Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

21. Withholding. The Company shall have the right to withhold from any amount payable hereunder any federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

22. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. The execution and delivery of counterparts of this Agreement, by facsimile, by electronic file transmission or by original manual signature, regardless of the means or any variation in pagination or appearance, shall be binding upon the Parties.

[*Signature Page(s) Follow*]






Media Access Portal

DocuSign Envelope ID: 1A0380B8-9290-4CDB-A1AC-16FD046531D9

IN WITNESS WHEREOF, the Parties hereto have caused this Employment Agreement to be duly executed and delivered as of the date first written above.

EMPLOYEE:

DocuSigned by:
A0D90E1E98B34EB...
Robert C. Bowser

COMPANY:

FOUNDATION BUILDING MATERIALS, LLC,
a California limited liability company

By: DocuSigned by: Ruben Mendoza
A19251523E9043F...
Name: Ruben Mendoza
Title: President and Chief Executive Officer

Media Access Portal

E-FILED
11/21/2024 3:50 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

FULTZ MADDOX DICKENS PLC
ADRIANNE J. SIMON (Cal. Bar No. 150227)
101 South Fifth Street, Suite 2700
Louisville, KY 40202-3116
Phone: (502) 588-2000
Fax: (502) 588-2020

Attorney for Plaintiff Robert C. Bowser

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF ORANGE**

| | |
|---|---|
| Robert C. Bowser,<br><br>Plaintiff,<br><br>v.<br><br>FOUNDATION BUILDING MATERIALS, LLC, a limited liability company; and DOES 1 through 10,<br><br>Defendants. | CASE NO. ___________________<br><br>**COMPLAINT AND REQUEST FOR DECLARATORY RELIEF** |

Plaintiff Robert C. Bowser, ("Plaintiff"), files this Complaint and Request for Declaratory Relief on the following grounds:

**<u>THE PARTIES</u>**

1. Defendant Foundation Building Materials, LLC ("FBM") is a California limited liability company. At all times relevant, FBM was the employer of Plaintiff. Its address is 2520 Red Hill Avenue, Santa Ana, California 92705. FBM conducts business in all 50 states and Canada.

2. A&D Supply of Nashville, LLC ("A&D") was an Oklahoma limited liability company. On October 2, 2023, FBM purchased substantially all the assets of A&D.

3. Plaintiff was an employee of A&D. Plaintiff was not an owner of A&D and had no vendible interest in A&D.



Case 3:24-cv-01434 Document 1-2 Filed 12/05/24 Page 57 of 82 PageID #: 63
Exhibit 4
Media Access Portal

4. After FBM purchased A&D, Plaintiff became an employee of FBM.

5. Ironline Metals, LLC ("Ironline") is a Delaware limited liability company and has offered employment to Plaintiff.

6. Plaintiff does not presently know the names of the DOE Defendants sued by fictious names as DOES 1 through 10 at this time.

7. Plaintiff is an employee of FBM and lives and resides in Tennessee.

8. Venue and jurisdiction are proper in this Court because each of the acts, events, and damages alleged herein arise out of FBM's actions, and FBM doing business in Orange County.

**STATEMENT OF FACTS**

9. Occasionally, companies will use restraints of trade and the threat of non-compete litigation to intimidate employees from switching companies and to deter competitors from recruiting their employees-rather than having to compete for the services of their own employees.

10. If employees and business had to incur the risk and cost of non-compete litigation if they switched companies or recruited another company's employees, employees would be far less likely to switch employment, employers would be far less likely to offer them employment, and California would lose the benefits of free competition and employee mobility. California courts refer to this as the "in terrorem effect" of contractual restraints of trade. (*Latona v. Aetna United States Healthcare, Inc.*, 82 F.Supp.2d 1089, 1096 (C.D.Cal. 1999)).

11. The Legislature has addressed this by declaring contracts with restraint of trade elements void. (Bus. & Prof. Code § 16600). The Legislature specified three types of covenants not to compete that are permitted in California: (1) covenants arising out of the sale of goodwill of a business or ownership interest in or operating assets of an entity (*id.* § 16601); (2) covenants arising out of the dissolution or disassociation of a partnership (*id.* § 16602); and (3) covenants arising out of the dissolution or sale of a limited liability company (*id.* § 16602.5).


Media Access Portal
Case 3:24-cv-01434 Document 1-2 Filed 12/05/24 Page 58 of 82 PageID #: 84
Exhibit 4

12. The Legislature recently added Section 16600.5, by passing Senate Bill 699, declaring that employers are prohibited from enforcing a non-compete agreement in California that is void under state law, regardless of whether the former employment was outside of California and the agreement was signed outside of the state (Bus. & Prof. Code § 16600.5).

13. The Legislature also declared, "Noncompete clauses in employment contracts are extremely common in the United States. Research shows that one in five workers are currently subject to a noncompete clause out of approximately 30 million workers nationwide. The research further shows that California employers continue to have their employees sign noncompete clauses that are clearly void and unenforceable under California law. Employers who pursue frivolous noncompete litigation has a chilling effect on employee mobility." (S.B. 699 § 1(a)).

14. By February 14, 2024, all California employers were required to notify, by written communication, all employees whose employment contracts include a noncompete clause that the noncompete clause or noncompete agreement is void. (Bus. & Prof. Code § 16600.1).

15. On or about October 2, 2023, A&D entered into an Asset Purchase Agreement with and sold substantially all of its assets to FBM (the "Transaction").

16. Upon the completion of the Transaction, Plaintiff accepted full-time employment with FBM.

17. Plaintiff was not an owner of A&D, and he had no vendible interest in A&D. Plaintiff was merely an employee of A&D.

18. Plaintiff entered into an Employment Agreement ("Agreement") with FBM and DOE Defendants.[1]

19. Section 4(c) of the Agreement is entitled "Agreement Not to Solicit Employees," and section 4(d) is entitled "Agreement Not to Solicit Customers"

[1] A true and correct copy of the Employment Agreement is attached as **Exhibit 1.**



Media Access Portal

(collectively referred to as the "Non-solicitation Covenants").

20. The Non-solicitation Covenants prohibit Plaintiff from directly or indirectly soliciting, inducing, or otherwise causing any FBM employee or customer to terminate, curtail, or modify its relationship with FBM, nor engage in business with any competitor of FBM for a period of two (2) years after Plaintiff's termination of employment with FBM.

21. Section 4(e) of the Agreement is entitled "Agreement Not to Compete" ("Covenant Not to Compete") and reads as follows:

> In order to protect the legitimate business and customer goodwill interests of the Company, to protect that Confidential Information against inappropriate use or disclosure, and in consideration for the Employee's employment and the benefits provided to the employee (including, without limitation, the benefits payable to the Employee pursuant to this Agreement), the Employee hereby agrees that during the Restricted Period, whether voluntary or involuntary, the Employee shall not directly or indirectly own any interest in, managing, controlling, participating in (whether as an officer, director, manager, employee, partner, equity holder, member, agent, representative or otherwise), consulting with, rendering services for or in any other manner engaging in any Competitive Business anywhere within 50 miles of the branch(es) of the Company that Employee oversees or engages in a would be Competitive Business…
>
> A "Competitive Business" is defined as "any business enterprise, other than the Company and its affiliates that is engaged in (a) the business of supplying and distributing of building materials, including without limitation, drywall, insulation including glass fiber, fiberglass blowing wool and fiberglass batts, mineral wool and cellulose used in interiors applications in residential and commercial construction) ceiling tiles and grid, metal track and studs, exterior insulation finish systems, doors, frames and hardware, lumber, fasteners and adhesive, tools and other related products

22. Plaintiff has not received notice from FBM that the Covenant Not to Compete is void.

23. California law provides for a $2,500.00 per violation penalty for failure to provide notice to employees that an employee's non-compete agreement is void under California law.

24. Recently, Plaintiff received an offer for employment with Ironline. Ironline


Media Access Portal

is a company that ostensibly is covered by the Covenant Not to Compete.

25. Plaintiff now seeks to seize his employment opportunity but is hindered by the illegally restrictive nature of FBM's and DOE Defendant's Covenant Not to Compete and Non-solicitation Covenants.

**FIRST CAUSE OF ACTION**

**Declaratory Judgment/Declaratory Relief – Covenant Not to Compete is an Unlawful Contract and Restraint of Trade**

26. Plaintiff incorporates by reference paragraphs 1 through 24 inclusive as though fully set forth at length herein.

27. An actual controversy exists between Plaintiff, on the one hand, and FBM and DOE Defendants, on the other, regarding their respective rights, duties, future obligations, and legal exposures and as to the legality, validity, and enforceability of contractual restraints of trade imposed by FBM and DOE Defendants on Plaintiff including without limitation the covenant not to compete, non-solicitation, and choice-of-law provision in FBM's and DOE Defendants' Agreement.

28. Specifically, Plaintiff contends that the non-competition provisions found in the Covenant Not to Compete serves to restrain trade and thus constitute an unlawful restraint on trade in violation of California Business and Professions Code sections 16600 and 16600.1, and California's long recognized and fundamental public policy against such provisions. (See *Edwards v. Arthur Andersen LLP*, 44 Cal.4th 937, 945-46 (2008)). The inclusion of unlawful provisions invalidates the agreements in their entirety, including the choice of law and forum selection provisions. (See *Application Group, Inc. v. Hunter*, 61 Cal.App.4th 881 (1998); *Brack v. Omni Loan Company*, Ltd., 164 Cal.App.4th 1312, 1323-1324 (2008); *Hall v. Sup.Ct. (Imperial Petroleum, Inc.)*, 150 Cal.App.3d 411 (1983); *Silguero v. Creteguard*, 187 Cal.App.4th 60, 69-70 (2010)).

29. Plaintiff also contends that the provisions in the Non-solicitation Covenants are overly broad and serve to restrain employees from practicing their chosen profession, and thus constitute an unlawful restraint on trade in violation of California Business and



Media Access Portal

Professions Code sections 16600 and 16600.1. Because non-solicitation agreements restrain trade, courts hold that they are covered by Cal. Bus. & Prof. Code § 16600. (See *The Retirement Group v. Galante*, 176 Cal. App. 4th at 1241). These agreements are analyzed under a strict scrutiny standard. (See *Edwards v. Arthur Anderson LLP*, 44 Cal. 4th at 945-50). They must be very narrowly drawn and are not enforced if they are so broad in effect as to amount to a non-compete. (See *Kolani v. Gluska*, 64 Cal.App.4th 407 (1998)).

30. Plaintiff believes that the contractual restraints of trade imposed by FBM and DOE Defendants on him are void *ab initio*.

31. Section 16600 and 16600.5 express California's strong public policy in favor of free competition and employee mobility and betterment. They are enforceable through, *inter alia*, California's Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq*.) and California's Declaratory Relief Act (Cal. Civ. Proc. Code §§ 1060 *et seq*.).

32. Section 16600 voids any contractual provision restraining anyone from engaging in a lawful profession, trade, or business of their choosing.

33. Section 16600.5 renders any contract that is void under Section 16600 unenforceable regardless of where and when the contract was signed. It also prohibits an employer or former employer from attempting to enforce a contract that is void under this Section regardless of whether the contract was signed and the employment was maintained outside of California.

34. Accordingly, Plaintiff requests entry of a judgment declaring that: (a) any contractual restrains of trade imposed on Plaintiff by FBM and DOE Defendants are void and unenforceable; (b) Plaintiff may lawfully be employed by Ironline; and (c) Plaintiff is free to work for Ironline in his chosen profession.

## SECOND CAUSE OF ACTION

## Violations of Unfair Competition Law

35. Plaintiff incorporates by reference paragraphs 1 through 33 inclusive as though fully set forth at length herein.


Case 3:24-cv-01434 Document 1-2 Filed 12/05/24 Page 62 of 82 PageID #: 68
Exhibit 4
Media Access Portal

36. Plaintiff is informed and believes that FBM and DOE Defendants, in publishing and/or seeking to enforce the Covenant Not to Compete and Non-solicitation Covenants as written, have engaged in unfair and unlawful business acts and practices as defined in California Business & Professions Code sections 17200 *et seq.*, in that the said Covenant Not to Compete and Non-solicitation Covenants unlawfully discourage competition between FBM and DOE Defendants and other building material manufacturers and distributors within the States of California or South Carolina, and are a restraint on trade. FBM and DOE Defendants' implementation of the Covenant Not to Compete and Non-solicitation Covenants are unfair and unlawful and were put in place by FBM and DOE Defendants to gain an unfair advantage over their competitors and Plaintiff.

37. FBM and DOE Defendants' use of non-competition and non-solicitation provisions in agreements they required Plaintiff to sign constitutes an unfair and unlawful business act or practice in violation of Business & Professions Code sections 16600, 16600.5, and 17200 *et seq.*

38. FBM and DOE Defendants' use of such unlawful and unfair business practices constitutes unfair and unlawful competition and provides an unlawful and unfair advantage to FBM in the marketplace. Plaintiff is informed and believes that FBM and DOE Defendants have profited, are profiting, and will continue to profit from their unlawful and unfair business practices.

39. FBM and DOE Defendants' failure to provide Plaintiff requisite notice of the Covenant Not to Compete being void violates Business & Professions Code section 16600.1.

40. Plaintiff, as well as Plaintiff's potential employers and/or competitors of FBM and DOE Defendants, have suffered and will suffer injury in fact as a result of the unfair competition and restraint on trade effected by FBM and DOE Defendants in enforcing or threatening to enforce its Covenant Not to Compete and Non-solicitation Covenants. Plaintiff and these businesses have suffered and continue to suffer financial


Case 3:24-cv-01434 Document 1-2 Filed 12/05/24 Page 63 of 82 PageID #: 69
Exhibit 4
Media Access Portal

damages with respect to loss of business as a result of the Covenant Not to Compete and Non-solicitation Covenants.

41. Unless restrained by the Court, Plaintiff and similarly situated members of the public, and competitors to FBM and DOE Defendants will continue to be harmed by FBM and DOE Defendants as a result of the unlawful and unfair aforementioned acts by FBM and DOE Defendants. Plaintiff has been harmed and now seeks a determination by the Court that the use of the non-compete and non-solicitation provisions violate Business & Professions Code sections 17200, *et seq.*, and seeks preliminary and permanent injunctive relief prohibiting the same.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For a declaration that the Covenant Not to Compete and Non-solicitation Covenants in FBM's and DOE Defendants' employment contract be struck down as void and unenforceable as a violation of California's unfair competition law;

2. For a declaration that the Covenant Not to Compete and Non-solicitation Covenants in FBM's and DOE Defendants' employment contract are void under California law as an unlawful contract in restraint of trade;

3. For injunctive relief pursuant to California Business and Professions Code sections 17200, *et seq.*, halting further enforcement of the Covenant Not to Compete and Non-solicitation Covenants;

4. For attorneys' fees and costs of suit herein incurred pursuant to contract and statute; and

5. For such other and further relief as the Court may deem just and proper.


Case 3:24-cv-01434 Document 1-2 Filed 12/05/24 Page 64 of 82 PageID #: 70
Exhibit 4
Media Access Portal

DATED: July 22, 2024

Respectfully submitted,
ADRIANNE J. SIMON
FULTZ MADDOX DICKENS PLC

By: */s/ Adrianne J. Simon*
*Adrianne J. Simon*
*Attorney for Plaintiff ROBERT C. BOWSER*

Media Access Portal

# EXHIBIT 1

Media Access Portal

# EMPLOYMENT AGREEMENT

This EMPLOYMENT AGREEMENT (this "Agreement") is entered into as of October 2, 2023 between Foundation Building Materials, LLC, a California limited liability company (the "Company") and Robert C. Bowser, an individual (the "Employee") (each of the foregoing individually a "Party" and collectively the "Parties").

## RECITALS

WHEREAS, the Company, on the one hand, and A&D Supply of Nashville, LLC, an Oklahoma Limited Liability Company, (the "Seller"), on the other hand, are parties to an Asset Purchase Agreement, dated of even date herewith (the "Purchase Agreement"), among others named as "Seller Parties";

WHEREAS, solely upon the occurrence of the Closing (as defined in the Purchase Agreement), the Company wishes to employ the Employee and the Employee wishes to be employed by the Company, in each case, on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the covenants, promises and representations set forth herein, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1. Employment. The Employee's employment hereunder shall commence on the Closing Date (as defined in the Purchase Agreement) or such other date as may be mutually agreed between the Parties (the "Effective Date") and end on the date that the Employee's employment is terminated pursuant to Section 3 hereof (the "Employment Period"). In the event that the Purchase Agreement is terminated in accordance with its terms prior to the Closing of the transactions contemplated thereby, this Agreement shall be null and void and without effect. During the Employment Period, the Employee shall serve as the Nashville Sales Manager, reporting to Regional Vice President of the Southeast, Sales of the Company ("General Manager"). In such position, the Employee shall have such duties, authority, and responsibility as shall be determined from time to time by the General Manager, which duties, authority, and responsibility shall be consistent with the Employee's position. During the Employment Period, the Employee will devote his full business time and use his best efforts to advance the business and welfare of the Company and its subsidiaries and other affiliates and will not engage in (i) any other employment or business activities, or (ii) any other activities for any direct or indirect remuneration that could reasonably be expected to be harmful or detrimental to the business and affairs of the Company or that could reasonably be expected to materially interfere with his duties hereunder. The foregoing, however, shall not preclude the Employee from (i) serving on civic or charitable boards or committees, managing personal or family investments, or engaging in such other activities as the Board of Directors of the Company or its equivalent (such entity, the "Board") may approve in writing from time to time, or (ii) passively investing in other businesses; *provided* that such investment does not exceed two percent (2%) of publicly traded securities of any corporation or

Media Access Portal

that Employee is not a controlling person of, or a member of a group that controls, such corporation; *provided, further,* that such activities in (i) and (ii) do not materially interfere with the performance of the Employee's responsibilities hereunder.

2. Compensation.

(a) Base Salary. The Employee shall receive a base salary at a rate of $171,600 through 2023, which shall be paid in accordance with the customary payroll practices of the Company. Beginning January 1, 2024, Employee shall receive a base salary at a rate of $145,330 which shall be paid in accordance with the customary payroll practices of the Company and shall be subject to review on an annual basis as determined by the Board or a committee thereof (the "Base Salary"). The Employee's Base Salary shall not be subject to decrease, other than a reduction which is part of a general cost reduction approved by the Board affecting other similarly situated employees and which does not exceed ten percent (10%) of the Employee's then Base Salary when combined with any such prior reductions.

(b) Annual Bonus. With respect to each calendar year ending during the Employment Period, in addition to the Base Salary, the Employee shall have the opportunity to earn an annual cash performance bonus (the "Annual Bonus") based upon the achievement of performance targets established by the Board (or a committee thereof) in accordance with the terms of the annual cash performance bonus plan in effect with respect to such calendar year, if the Board (or a committee thereof) determines, in its sole and absolute discretion, to adopt such a plan in such calendar year. Each Annual Bonus (and the target amount of such Annual Bonus) shall be determined in accordance with such plan, if any, in effect for such calendar year. For the period beginning on the Effective Date and ending on the last day of the applicable calendar year, the Employee shall be eligible to receive a prorated Annual Bonus (calculated as the Annual Bonus that would have been paid for the entire calendar year multiplied by a fraction the numerator of which is equal to the number of days the Employee worked in the applicable calendar year and the denominator of which is equal to the total number of days in such year). Except as otherwise provided in Section 3, in order to receive payment of any Annual Bonus for a particular calendar year, the Employee must be continuously employed by the Company through the date of actual payment. Each Annual Bonus, if any, will be paid within two and a half (2½) months after the end of the applicable calendar year to which such Annual Bonus relates.

(c) Participation in Benefit Plans. During the Employment Period, the Employee shall be entitled to receive all perquisites and participate in all of the benefit plans, programs and policies maintained by the Company from time to time that are available generally to its similarly situated employees; *provided, however,* that the Employee's right to receive such perquisites and participate in such plans, programs and policies shall not affect the Company's right to amend or terminate the general applicability of such perquisites, plans, programs and policies. The Company may, in its sole discretion and from time to time, amend, eliminate, or establish benefit programs as it deems appropriate.

(d) Expenses. The Company shall reimburse the Employee for all reasonable travel and other business expenses incurred by him in the performance of his duties to the Company in accordance with the Company's applicable expense reimbursement policies and procedures in






Media Access Portal

effect from time to time. Any expenses shall be reimbursed promptly in accordance with such policies and procedures.

(e) Paid Time Off. The Employee shall be entitled to such periods of paid time off ("PTO") each year as provided from time to time under the Company's PTO policy and as otherwise provided for similarly situated employees.

(f) Claw back. Notwithstanding any other provisions in this Agreement to the contrary, any incentive-based or other compensation paid to the Employee under this Agreement or any other agreement or arrangement with the Company which is subject to recovery under any law, government regulation, stock exchange listing requirement or policy established by the Company will be subject to such deductions and claw back as may be required to be made pursuant to such law, government regulation, stock exchange listing requirement, or policy established by the Company providing for claw back or recovery of amounts that were paid to the Employee (whether in existence as of the Effective Date or later adopted).

3. Termination of Employment. Subject to the further provisions of this Section 3, the Employment Period and the Employee's employment hereunder may be terminated by either Party at any time and for any or no reason; *provided, however*, that the Company and the Employee will be required to give written notice of any termination of the Employee's employment as set forth in this Section 3. Notwithstanding any other provision of this Agreement, the provisions of this Section 3 shall exclusively govern the Employee's rights to compensation and benefits upon termination of employment with the Company.

(a) Notice of Termination. Any termination or resignation of the Employee's employment by the Company or by the Employee, as applicable, under this Section 3 (other than termination of employment as a result of the Employee's death) shall be communicated by a written notice (a "Notice of Termination") to the other Party hereto (i) to the extent applicable, indicating whether the termination is for or without Cause (as defined below), or the facts, circumstances or reasoning behind the resignation, (ii) indicating the specific termination provision in this Agreement relied upon, and (iii) specifying a date of termination (the "Date of Termination"), which, if submitted by the Employee, shall be thirty (30) days following the date of such notice (which date may be earlier as determined by the Company, without changing the characterization of such termination), if submitted by the Company for Cause, the first business day following the last day of the Employee's Cure Period if applicable (as defined below), or such other date as is mutually agreed by the Company and the Employee.

(b) Accrued Rights. Upon a termination of the Employee's employment for any reason, the Employee (or the Employee's estate) shall be entitled to receive the sum of the Employee's Base Salary through the Date of Termination not theretofore paid (payable as soon as practicable following, but in all events within 30 days of the Date of Termination); any unreimbursed business expenses incurred in accordance with the Company's policies in effect from time to time; and any amount arising from the Employee's participation in, or benefits under, any employee benefit plans, programs or arrangements (including without limitation, any disability or life insurance benefit plans, programs or arrangements), which amounts shall be payable in accordance with the terms and conditions of such employee benefit plans, programs or arrangements (collectively, the "Accrued Rights").



Media Access Portal

(c) Termination by the Company; Resignation.

(i) If the Employee's employment is terminated (i) by the Company with or without Cause at any time or (ii) upon the Employee's resignation, the Employee shall only be entitled to receive the Accrued Rights. Following the Employee's termination of employment by the Company at any time, or upon the Employee's resignation, except as set forth in this Section 3(d), the Employee shall have no further rights to any compensation or any other benefits under this Agreement.

(ii) "Cause" shall be deemed to exist if any one or more of the following items shall apply: (A) a material breach of any written agreement between the Employee and the Company or any affiliate, including, without limitation, a material breach by the Employee of the Employee's obligations under this Agreement or any other written agreement between the Employee and the Company or an affiliate; (B) non-performance by the Employee of his duties and responsibilities to the Company (other than any such non-performance resulting from the Employee's incapacity due to physical or mental illness or any such non-performance after his issuance of a written notice to the Company of his intention to resign), (C) intentional or negligent misconduct or engagement in dishonesty by the Employee, which is, in each case, injurious to the Company or any affiliate, (D) a material violation by the Employee of any written policies of the Company, including written policies related to discrimination, harassment, performance or illegal or unethical activities and ethical misconduct, or the valid and lawful directions of the Board, General Manager or the Employee's direct supervisor; (E) a breach of any fiduciary duty which the Employee owes to the Company or any affiliate in his capacity as an employee or officer; (F) embezzlement, misappropriation, or fraud by the Employee, whether or not related to the Employee's employment with the Company; (G) the indictment for, conviction or plea of guilty or no contest by the Employee with respect to (a) a felony or (b) embezzlement, dishonesty, a crime involving moral turpitude, or intentional and actual fraud; (H) the use of illicit drugs or other illicit substances or the abuse of licit drugs or other substances on Company premises or during the performance of the Employee's duties or that otherwise causes material harm to the Company or any affiliate; (I) an unexplained or unexcused absence from work for more than ten (10) days in any twelve (12) month period (vacation, Company-approved personal leave, Company-approved sick leave, and Disability excepted); or (J) engagement in conduct that brings or is reasonably likely to bring the Company negative publicity or into public disgrace, embarrassment, or disrepute. The Employee's employment will be deemed to have been terminated for Cause if it is determined subsequent to his termination of employment (for any other reason) that grounds for termination of his employment for Cause existed at the time of his termination of employment. In each such case of Cause, the Company shall provide the Employee with written notice specifying in reasonable detail the grounds for a Cause termination and with respect to subsections (A), (B) and (D), the Employee shall have a period of thirty (30) days to cure, if curable as determined by the Company, after receipt of the written notice (the "Employee's Cure Period").

(d) Disability or Death. The Employment Period and the Employee's employment hereunder shall terminate immediately upon the Employee's death and may be terminated by the Company if the Employee becomes or is reasonably expected to be (in the good

Media Access Portal

faith judgment of the Board or the General Manager) physically or mentally incapacitated and therefore unable for a period of one hundred twenty (120) consecutive days to perform the essential functions of the Employee's position, for or without a reasonable accommodation (such incapacity is hereinafter referred to as "Disability"), in each case, in a manner consistent with applicable state and federal law. Upon termination of the Employee's employment hereunder by reason of his Disability or death, the Employee or the Employee's estate (as the case may be) shall only be entitled to receive (i) the Accrued Rights and (ii) such additional payments, if any, as determined by the Board in its sole and absolute discretion. Following the termination of the Employee's employment by reason of the Employee's Disability or death, except as set forth in this Section 3(e), the Employee shall have no further rights to any compensation or any other benefits under this Agreement, *provided, further*, that in the event the Company temporarily replaces the Employee, or transfers the Employee's duties or responsibility to another individual on account of the Employee's inability to perform such duties due to a physical or mental incapacity which is, or is reasonably expected to become, a Disability, then the Employee's employment shall not be deemed terminated by the Company.

(e) Acknowledgement. Employee acknowledges and agrees that, other than the payments described in Section 3(b), 3(c) and 3(d), upon the Date of Termination, Employee shall not be entitled to any other severance or severance payments of any kind under any employee benefit plan or severance policy generally available to the Company's employees or otherwise and, except as otherwise specified herein, all other rights of Employee to compensation under this Agreement shall end as of the Date of Termination.

(f) Return of Property. Upon cessation of the Employee's employment with the Company for any reason, whether voluntary or involuntary, the Employee shall immediately deliver to the Company (i) all physical, computerized, electronic or other types of records, documents, proposals, notes, lists, files and any and all other materials, including computerized and electronic information, that refers, relates or otherwise pertains to the Company or any affiliate of the Company (or business dealings thereof) that are in the Employee's possession, subject to the Employee's control or held by the Employee for others; and (ii) all property or equipment that the Employee has been issued by the Company or any affiliate of the Company during the course of his employment or property or equipment thereof that the Employee otherwise possesses, including any computers, cellular phones, pagers and other devices, and any logins or passwords for any such devices. The Employee acknowledges that the Employee is not authorized to retain any physical, computerized, electronic, or other types of copies of any such physical, computerized, electronic or other types of records, documents, proposals, notes, lists, files or materials, and is not authorized to retain any other property or equipment of the Company or any affiliate of the Company. The Employee further agrees that the Employee will promptly forward to the Company (and thereafter destroy any physical or electronic copies thereof) any Confidential Information (as defined below) relating to the Company or any affiliate of the Company that has been or is inadvertently directed to the Employee following the Employee's last day of employment. The provisions of this Section 3(f) are in addition to any other written obligations on the subjects covered herein that the Employee may have with the Company and its affiliates, and are not meant to and do not excuse such obligations. Upon the termination of his employment with the Company or its subsidiaries, the Employee shall, upon the Company's request, promptly execute and deliver to the Company a certificate (in form and substance satisfactory to the Company) to the effect that the Employee has complied with the provisions of this Section 3(f).






Media Access Portal

DocuSign Envelope ID: 1A0380B8-9290-4CDB-A1AC-16FD046531D9

(g) Resignation of Offices. Promptly following any termination of the Employee's employment with the Company, the Employee shall be deemed to have resigned from all positions that the Employee may then hold as an employee, officer, director or manager of the Company or any affiliate of the Company. The Employee or the Employee's legal representative shall promptly deliver to the Company any additional documents reasonably required by the Company to confirm such resignations.

(h) Further Assurances; Cooperation. Following the termination of the Employee's employment with the Company, the Employee shall execute any and all documents to secure the Company's right to any Work Product (as defined in Section 4(b)), and the Employee agrees to make himself available as reasonably practical with respect to, and to use reasonable efforts to cooperate in conjunction with, any litigation or investigation arising from events that occurred during the Employee's employment with the Company and its affiliates (whether such litigation or investigation is then pending or subsequently initiated) involving the Company or any affiliate of the Company, including providing testimony and preparing to provide testimony if so requested by the Company. The Company shall reimburse the Employee for any reasonable out of pocket expenses incurred by the Employee in complying with this Section 3(h), provided that such expenses are approved by the Company in advance.

4. Restrictive Covenants. The Employee acknowledges that the Company has spent significant time, effort and resources protecting its Confidential Information and customer goodwill. The Employee further acknowledges that the Confidential Information is of significant competitive value to the Company in the industry in which it competes, and that the use or disclosure, even if inadvertent, of such Confidential Information for the benefit of a competitor would cause significant damage to the legitimate business interests of the Company.

(a) Confidential Information. During Employee's employment with the Company, the Employee will be given access to and receive Confidential Information regarding the business of the Company and its affiliates. The Employee agrees that the Confidential Information constitutes protectable business interests of the Company and its affiliates and covenants and agrees that at all times during the Employee's employment with the Company, and at all times following the Employee's termination, the Employee will not, directly or indirectly, disclose any Confidential Information. As used in this Agreement, the term "Confidential Information" means any and all confidential, proprietary or trade secret information of the Company or an affiliate not within the public domain, whether disclosed, directly or indirectly, verbally, in writing (including electronically) or by any other means in tangible or intangible form, including that which is conceived or developed by the Employee, applicable to or in any way related to: (i) the present or future business activities, products and services, and customers and suppliers of the Company or its affiliates; (ii) the research and development of the Company or its affiliates; or (iii) the business of any customer or vendor of the Company or its affiliates. Such Confidential Information includes the following property or information of the Company or its affiliates, by way of example and without limitation, trade secrets, processes, formulas, data, program documentation, customer lists, supplier lists, designs, drawings, algorithms, source code, object code, know-how, improvements, inventions, licenses, techniques, all plans or strategies for marketing, development and pricing, business plans, financial statements, profit margins and all information concerning existing or potential clients, suppliers or vendors. Confidential Information of the Company also means all similar information disclosed to any member of the



Media Access Portal

Company by third parties that is subject to confidentiality obligations. The Company shall not be required to advise the Employee specifically of the confidential nature of any such information, nor shall the Company be required to affix a designation of confidentiality to any tangible item, in order to establish and maintain its confidential nature. Notwithstanding the preceding to the contrary, Confidential Information shall not include general industry information or information that is publicly available or readily discernable from publicly available products or literature; information that the Employee lawfully acquires from a source other than the Company or its affiliates or any client or vendor of the Company or any of its affiliates (provided that such source is not bound by a confidentiality agreement with the Company or any of its affiliates); information that is required to be disclosed pursuant to any law, regulation, rule of any governmental body or authority, or stock exchange, or court order; or information that reflects Employee's own skills, knowledge, know-how and experience gained prior to employment or service and outside of any connection to or relationship with the Company or any of its affiliates, or the predecessors of any such entities; and information that was known by the Employee prior to his employment with the Company. Notwithstanding the foregoing, Employee will not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that: (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal. In addition, if Employee files a lawsuit for retaliation by Company for reporting a suspected violation of law, Employee may disclose the trade secret to Employee's attorney and use the trade secret information in the court proceeding if Employee files any document containing the trade secret under seal and does not disclose the trade secret except pursuant to court order.

(b) Intellectual Property Ownership. The Employee hereby assigns to the Company all rights, including, without limitation, copyrights, patents, trade secret rights, and other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes, works of authorship, Confidential Information or trade secrets (i) developed or created by the Employee, solely or jointly with others, during the course of performing work for or on behalf of the Company or any affiliate of the Company, or the predecessors of any such entities, whether as an employee or independent contractor, (ii) that the Employee conceives, develops, discovers or makes in whole or in part during the Employee's employment by the Company that relate to the business of the Company or any affiliate of the Company or the actual or demonstrably anticipated research or development of the Company or any affiliate of the Company, (iii) that the Employee conceives, develops, discovers or makes in whole or in part during or after the Employee's employment by the Company that are made through the use of any of the equipment, facilities, supplies, trade secrets or time of the Company or any affiliate of the Company, or that result from any work the Employee performs for the Company or any affiliate of the Company, or (iv) developed or created by the Employee, solely or jointly with others, at any time before the Employment Period, that relate to or involve the Company's businesses (including, but not limited to, the business of the Company or any of its affiliates) (collectively, the "Work Product"). This Agreement does not include assignment of any of the Employee's rights to any invention for which no equipment, supplies, facilities or trade secret information of the Company was used and which was developed entirely on the Employee's own time, unless (a) the invention relates (i) directly to the business of the Company, or (ii) to the Company's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by the Employee for the



Media Access Portal

Company. Without limiting the foregoing assignment, to the extent possible, all software, compilations and other original works of authorship included in the Work Product will be considered a "work made for hire" as that term is defined in Title 17 of the United States Code. If, notwithstanding the foregoing, the Employee for any reason retains any right, title or interest in or relating to any Work Product, the Employee agrees promptly to assign, in writing and without any requirement of further consideration, all such right, title, and interest to the Company. Upon request of the Company at any time during or after the Employment Period, the Employee will take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to evidence, perfect, record or otherwise give full and proper effect to any assignments of rights under or pursuant to this Agreement. The Employee will promptly disclose to the Company any such Work Product in writing.

(c) Agreement Not to Solicit Employees. The Employee agrees that during the period commencing on the Effective Date and ending on the date that is two (2) years after the Date of Termination, whether voluntary or involuntary (the "Restricted Period"), the Employee shall not, directly or indirectly, on behalf of himself or any other person or entity (A) cause, induce, or attempt to cause or induce any employee, agent, or independent contractor of the Company (who had that status prior to the Date of Termination) to terminate such relationship; (B) in any way interfere with the relationship between the Company and any of its employees, agents, or independent contractors; or (C) hire, retain, employ, or otherwise engage or attempt to hire, retain, employ, or otherwise engage as an employee or otherwise, any employee of the Company prior to the Date of Termination.

(d) Agreement Not to Solicit Customers. The Employee agrees that during the Restricted Period, the Employee shall not, directly or indirectly, on behalf of himself or any other person or entity (A) solicit, induce, or otherwise cause, or attempt to solicit, induce, or otherwise cause, any customer, supplier, licensor, licensee, or any prospective customer, supplier, licensor, or licensee that has been contacted or targeted for contact by the Company at any time prior to the Date of Termination, or any other person engaged in a business relationship with the Company at any time prior to the Date of Termination, to (1) terminate, curtail, or otherwise modify its relationship with the Company or the Company's affiliates or (2) engage in business with a competitor of the Company or the Company's affiliates, or (B) interfere in any way with the relationship between the Company and its affiliates, on the one hand, and any of their respective current or prospective customers, suppliers, licensors, licensees, or any other person engaged in a business relationship with the Company or its affiliates, except as directed by and for the benefit of the Company or its affiliates.

(e) Agreement Not to Compete. In order to protect the legitimate business and customer goodwill interests of the Company, to protect that Confidential Information against inappropriate use or disclosure, and in consideration for the Employee's employment and the benefits provided to the Employee (including, without limitation, the benefits payable to the Employee pursuant to this Agreement), the Employee hereby agrees that during the Restricted Period, whether voluntary or involuntary, the Employee shall not directly or indirectly own any interest in, manage, control, participate in (whether as an officer, director, manager, employee, partner, equity holder, member, agent, representative or otherwise), consult with, render services for, or in any other manner engage in any Competitive Business anywhere within 50 miles of the branch(es) of the Company that Employee oversees or engages in a would be Competitive

Media Access Portal

Business; *provided*, that nothing herein shall prohibit the Employee from being, directly or indirectly, a passive owner of not more than 2% of the outstanding stock of any class of a corporation which is publicly traded so long as the Employee does not have any active participation in the business of such corporation. "Competitive Business" means any business enterprise, other than the Company and its affiliates, that is engaged in (a) the business of supplying and distributing building materials, including, without limitation, drywall, insulation (including glass fiber, fiberglass blowing wool and fiberglass batts, mineral wool, and cellulose used in interiors applications in residential and commercial construction), ceiling tiles and grid, metal track and studs, exterior insulation finish systems, doors, frames and hardware, lumber, fasteners and adhesives, tools, and other related products, and providing related services, (b) any other business conducted by the Company or the Company's affiliates as of the Date of Termination, as such business may be extended or expanded as contemplated by the strategic plan of the Company or any of its affiliates as of the Date of Termination, including, without limitation, entities such as GMS, US LBM, Rosen, Feldman Lumber, ABC Supply-L&W Supply, Kamco, Rew, INEX, Service Partners, Insulation Distributors Inc (IDI), Installed Building Products (IBP), or independent ventures that operate wholly or partially in that business; provided however, Employee may become an employee of a roofing, concrete or paving business so long as 1) such business is not a Competitive Business; 2) such employment does not begin within six (6) months of the Effective Date of this Agreement; and 3) Employee continues to comply with all confidentiality, non-solicit of Employee, and non-solicit of Customer obligations, specifically including those in 4(a)-(d). This Section 4(e) does not affect any other non-competition agreements entered into by the Employee with the Company.

(f) Non-Disparagement. Employee agrees not to directly or indirectly make any statements (whether such statement legally constitutes libel or slander), or cause or encourage others to make any statements, that defame, disparage or in any way criticize or otherwise reflect negatively on the personal or business reputations, practices or conduct of Company or any affiliate or each of its and their officers, directors, employees, agents, advisors, partners, affiliates, workers or consultants, or clients through any means, including, but not limited to, through the use of verbal, written, digital or electronic communications, including any and all social media platforms. Employee further agrees that Employee shall not directly or indirectly say or publish anything that shall, or may, bring Company's or any affiliate's officers, directors, employees, agents, advisors, partners, affiliates, workers or consultants into disrepute. Notwithstanding the foregoing, nothing in this Section shall prevent Employee from disclosing information regarding any unlawful conduct and/or discrimination to law enforcement, the Equal Employment Opportunity Commission, any local commission on human rights, and/or an attorney retained by the Employee.

(g) Enforcement. The Employee acknowledges having carefully read and considered all the terms and conditions of this Agreement, including the restraints imposed upon the Employee pursuant to this Section 4. The Employee agrees that each of the restraints contained herein are necessary for the protection of the goodwill, Confidential Information and other legitimate interests of the Company; that each and every one of these restraints is reasonable in respect to subject matter, length of time and geographic area; and that these restraints, individually or in the aggregate, will not prevent the Employee from obtaining other suitable employment during the period in which the Employee is bound by such restraints. The Employee further acknowledges that, were the Employee to breach any of the covenants contained in this Section 4, the damage to the Company would be irreparable. The Employee further acknowledges that






Media Access Portal

Company may suffer irreparable harm due to delay if, as a condition to obtaining an injunction, restraining order, temporary or provisional remedy or other equitable remedy with respect to the breach, the Company were required to demonstrate that it would suffer irreparable harm. The Employee therefore intends that if the Employee breaches one or more of the Employee's obligations under this Agreement, then for purposes of determining whether to grant an equitable remedy any court will presume that the breach would cause irreparable harm. The Employee therefore agrees that the Company, in addition to any other remedies available to it, shall be entitled to injunctive relief against any breach or threatened breach by the Employee of any of said covenants without any obligations to post a bond or other security.

(h) Modification. If at the time of enforcement of this Agreement, a court of competent jurisdiction holds that the restrictions stated herein are unreasonable under circumstances then existing, the Parties agree that the maximum period, scope or geographical area reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum period, scope and area permitted by applicable laws.

5. Severability. If any portion or provision of this Agreement shall to any extent be declared illegal or unenforceable by a court of competent jurisdiction, then the remainder of this Agreement, or the application of such portion or provision in circumstances other than those as to which it is so declared illegal or unenforceable, shall not be affected thereby, and each portion and provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. In the event of a conflict between the application to any particular facts or circumstances of Section 4(h) and this Section 5, Section 4(h) shall control and be given effect to the maximum extent permitted by applicable law prior to the application of this Section 5 to such facts and circumstances.

6. Mutual Drafting. Each Party has had the opportunity to be represented by counsel of its choice in negotiating this Agreement. This Agreement shall therefore be deemed to have been negotiated and prepared at the joint request, direction, and construction of the Parties, at arm's length, with the advice and participation counsel, and shall be interpreted in accordance with its terms without favor to either Party, and no presumption or burden of proof shall arise favoring or disfavoring either Party by virtue of the authorship of any of the provisions of this Agreement.

7. Section 409A of the Internal Revenue Code.

(a) Notwithstanding anything contained in this Agreement to the contrary, to the maximum extent permitted by applicable law, amounts payable to the Employee pursuant to Section 3 are intended to be made in reliance upon Treas. Reg. § 1.409A-1(b)(4) (short-term deferral) or Treas. Reg. § 1.409A-1(b)(9) (involuntary separation pay) or any other applicable exemption under Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"). No amounts payable under this Agreement upon the Employee's termination of employment shall be payable unless the Employee's termination of employment constitutes a "separation from service" within the meaning of Treas. Reg. § 1.409A- 1(h) (a "Separation from Service"). The Company and the Employee intend that their exercise of authority or discretion under this Agreement shall be consistent with the foregoing exemptions under, or comply with,





Media Access Portal

Section 409A. If any provision of this Agreement does not satisfy the requirements of Section 409A, such provision shall nevertheless be applied in a manner consistent with those requirements.

(b) If the Employee is a "specified employee" (as defined in Section 409A), as determined by the Company in accordance with Section 409A, on the date of the Employee's Separation from Service, to the extent that the payments or benefits under this Agreement are subject to Section 409A and the delayed payment or distribution of all or any portion of such amounts to which the Employee is entitled under this Agreement is required in order to avoid a prohibited distribution under Section 409A(a)(2)(B)(i), then such portion deferred pursuant to this Section 7(b) shall be paid or distributed to the Employee in a lump sum on the earlier of (i) the date that is six (6)-months following the Employee's Separation from Service, (ii) the date of the Employee's death or (iii) the earliest date as is permitted under Section 409A. Any remaining payments due under the Agreement shall be paid as otherwise provided herein.

(c) All reimbursements for costs and expenses under this Agreement shall be paid in no event later than the end of the calendar year following the calendar year in which the Employee incurs such expense. With regard to any provision herein that provides for reimbursement of costs and expenses or in-kind benefits, except as permitted by Section 409A, (i) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (ii) the amount of expenses eligible for reimbursements or in-kind, benefits provided during any taxable year shall not affect the expenses eligible for reimbursement or in-kind benefits to be provided in any other taxable year.

(d) If any provision of this Agreement would subject the Employee to additional tax or interest under Section 409A, the Company and the Employee shall amend this Agreement, or take such other actions as the Employee and the Company deem reasonably necessary or appropriate, to comply with the requirements of Section 409A and the Treasury Regulations thereunder (and any applicable transition relief) while preserving the economic agreement of the Parties. In no event whatsoever shall the Company be liable for any tax, interest or penalties that may be imposed on the Employee under Section 409A. Notwithstanding the foregoing, no particular tax result for the Employee with respect to any income recognized by the Employee in connection with this Agreement is guaranteed. Neither the Company nor any of its affiliates shall have any obligation to indemnify or otherwise hold the Employee harmless from any or all such taxes, interest, or penalties, or liability for any damages related thereto. The Employee acknowledges that the Employee has been advised to obtain independent legal, tax or other counsel in connection with Section 409A. Each payment under this Agreement is intended to be a "separate payment" and not a series of payments for purposes of Section 409A. Any payments or reimbursements of any expenses provided for under this Agreement shall be made in accordance with Treas. Reg. § 1.409A-3(i)(1)(iv). All references in this Agreement to Section 409A include rules, regulations, and guidance of general application issued by the Department of the Treasury under Section 409A.

8. <u>Governing Law</u>. This Agreement shall be construed and enforced under and be governed in all respects by the laws of the State of Tennessee, without regard to the conflict of laws principles thereof.



Media Access Portal

9. Binding Arbitration.

(a) Generally. The Employee and the Company agree that any controversy or claim arising out of or relating to this Agreement, the employment relationship between the Employee and the Company, or the termination thereof, including the arbitrability of any controversy or claim, which cannot be settled by mutual agreement will be finally settled by binding arbitration in accordance with the Expedited Arbitration Procedures of Judicial Arbitration & Mediation Service, Inc. ("JAMS"), as set forth in Section 16.1 et seq. of the JAMS rules, or any successor provision thereto, as follows: any Party aggrieved will deliver a notice to the other Party setting forth the specific points in dispute. Any points remaining in dispute twenty (20) days after the giving of such notice may, upon ten (10) days' notice to the other Party, be submitted to JAMS arbitration conducted before a single neutral arbitrator in Orange County, California. The arbitrator shall be appointed by agreement of the Parties hereto or, if no agreement can be reached, by JAMS. The arbitrator may enter a default decision against any Party who fails to participate in the arbitration proceedings. Notwithstanding the foregoing, a Party who seeks equitable relief, including injunctive relief, shall not be obligated to utilize the arbitration proceedings required hereunder and instead may seek such relief in any state or federal court of competent jurisdiction.

(b) Binding Effect. The decision of the arbitrator on the points in dispute will be final, unappealable and binding, and judgment on the award may be entered in any court having jurisdiction thereof. The arbitrator shall only be authorized to interpret the provisions of this Agreement, and shall not amend, change, or add to any such provisions. The Parties agree that this provision has been adopted by the Parties to resolve any disputes rapidly and inexpensively between them and that this provision will be grounds for dismissal of any court action commenced by either Party with respect to this Agreement, other than post-arbitration actions seeking to enforce an arbitration award or proceedings seeking equitable relief as permitted under Section 9(a). If any court determines that this arbitration procedure is not binding, or otherwise allows any litigation regarding a dispute, claim, or controversy covered by this Agreement to proceed, the Parties hereto hereby waive any and all right to a trial by jury in or with respect to such litigation.

(c) Fees and Expenses. Except as otherwise provided in this Agreement or by applicable law, the arbitrator will be authorized to apportion its fees and expenses as the arbitrator deems appropriate and the arbitrator will be authorized to award the prevailing Party its fees and expenses (including reasonable attorneys' fees). In the absence of any such apportionment or award, each Party will bear its own expenses and the fees of its own attorney.

(d) Confidentiality. The Parties and the arbitrator will keep confidential, and will not disclose to any person, except the Parties' advisors and legal representatives, or as may be required by law, the existence of any controversy under this Section 9, the referral of any such controversy to arbitration or the status or resolution thereof.

(e) Waiver. The Employee acknowledges that arbitration pursuant to this Agreement includes all controversies or claims of any kind (e.g., whether in contract or in tort, statutory or common law, legal or equitable) now existing or hereafter arising under any federal, state, local or foreign law, including, but not limited to, the Age Discrimination in Employment Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, the Employee Retirement Income Security Act, the Family and Medical Leave Act, the Americans With

Media Access Portal

Disabilities Act and all similar federal, state and local laws, and the Employee hereby waives all rights thereunder to have a judicial tribunal and/or a jury determine such claims.

(f) Acknowledgment. The Employee acknowledges that before agreeing to participate in this Agreement, the Employee has had the opportunity to consult with any attorney or other advisor of the Employee's choice, and that this provision constitutes advice from the Company to do so if the Employee chooses. The Employee further acknowledges that the Employee has agreed to enter into this Agreement of the Employee's own free will, and that no promises or representations have been made to the Employee by any person to induce the Employee to enter into this Agreement other than the express terms set forth herein. The Employee further acknowledges that the Employee has read this Agreement and understands all of its terms, including the waiver of rights set forth in this Section 9.

10. Notification to Subsequent Employer. When the Employee's employment with the Company terminates, the Employee agrees to notify any subsequent employer of the restrictive covenants contained in this Agreement. The Employee will also deliver a copy of such notice to the Company before the Employee commences employment with any subsequent employer. In addition, the Employee authorizes the Company to provide a copy of the restrictive covenant sections of this Agreement to third parties, including but not limited to, the Employee's subsequent, anticipated, or possible future employer.

11. Representations of the Employee. The Employee represents and warrants to the Company that: (a) the Employee's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which the Employee is a party or is otherwise bound; and (b) the Employee's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

12. Assignment. Neither the Company nor the Employee may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other; *provided, however,* that the Company may assign its rights and obligations to any affiliate or a successor to the business of the Company or all or substantially all of the assets of the Company without the consent of the Employee. This Agreement shall inure to the benefit of and be binding upon the Company and the Employee, their respective successors, executors, administrators, heirs and permitted assigns.

13. Waiver. No waiver of any provision hereof shall be effective unless made in writing and signed by the waiving Party. The failure of either Party to require the performance of any term or obligation of this Agreement, or the waiver by either Party of any breach of this Agreement, shall not prevent any subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach.

14. Attorneys' Fees. Should any litigation or other proceeding be commenced between the Parties concerning this Agreement (including, without limitation, the enforcement hereof and the rights and duties of the Parties hereunder), then the prevailing party in such litigation, arbitration or other proceeding shall be entitled, in addition to such other relief as may be granted,



Media Access Portal

DocuSign Envelope ID: 1A0380B8-9290-4CDB-A1AC-16FD046531D9

to its reasonable attorneys' fees and expenses in connection with such litigation, arbitration or other proceeding, but in all other circumstances each party shall bear its own attorneys' fees and expenses.

15. Notices. Any and all notices, requests, demands and other communications provided for by this Agreement shall be in writing and shall be effective when delivered in person, consigned to a reputable national courier service or deposited in the United States mail, postage prepaid, registered or certified, and addressed to the Employee at his last known address on the books of the Company or, in the case of the Company, at its principal place of business, attention of the Legal Department or to such other address as any Party may specify by notice to the other actually received.

16. Entire Agreement. This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties with respect to such subject matter, including, without limitation, any previous employment agreements entered into between Employee and the Company or any of its affiliates. Further, the Employee agrees that, upon the Effective Date of this Agreement, any prior employment agreement or arrangement between Employee, on the one hand, and the Seller Parties and any of its affiliates, on the other hand, shall be terminated and of no further force nor effect.

17. Amendment. This Agreement may be amended or modified only by a written instrument signed by the Employee and by an expressly authorized representative of the Company.

18. Headings. The headings and captions in this Agreement are for convenience only, and in no way define or describe the scope or content of any provision of this Agreement.

19. Tolling. If the Employee violates any of the terms of the restrictive covenant obligations articulated herein, the obligation at issue will run from the first date on which the Employee ceases to be in violation of such obligation.

20. Survival. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

21. Withholding. The Company shall have the right to withhold from any amount payable hereunder any federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

22. Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be an original and all of which together shall constitute one and the same instrument. The execution and delivery of counterparts of this Agreement, by facsimile, by electronic file transmission or by original manual signature, regardless of the means or any variation in pagination or appearance, shall be binding upon the Parties.

[*Signature Page(s) Follow*]



Case 3:24-cv-01434 Document 1-2 Filed 12/05/24 Page 80 of 82 PageID #: 86


Media Access Portal

IN WITNESS WHEREOF, the Parties hereto have caused this Employment Agreement to be duly executed and delivered as of the date first written above.

EMPLOYEE:

DocuSigned by:

A0D90E1E98B34EB...

Robert C. Bowser

COMPANY:

FOUNDATION BUILDING MATERIALS, LLC,
a California limited liability company

DocuSigned by:

By: Ruben Mendoza

A19251523E9043F...

Name: Ruben Mendoza
Title: President and Chief Executive Officer

Media Access Portal

E-FILED
11/21/2024 3:50 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

Contact

www.linkedin.com/in/robert-bowser-8a021a132 (LinkedIn)

# Robert Bowser

Sales Manager
Nashville Metropolitan Area

## Experience

### Ironline Metals
Sales Manager
July 2024 - Present (2 months)
Nashville, Tennessee, United States

### Foundation Building Materials
Sales Manager
October 2023 - July 2024 (10 months)
Nashville, Tennessee, United States

### A&D Supply Company
Sales Manager
December 2019 - October 2023 (3 years 11 months)
Nashville, Tennessee

### L&W Supply
South Central District Manager
January 2019 - September 2019 (9 months)
Nashville, Tennessee

### NexGen Building Supply
Sales Manager
November 2014 - June 2018 (3 years 8 months)